## NEWPORT COUNTY.

GEORGE KELLY *et al. vs.* THOMAS P. NICHOLS *et als.*

The opinion heretofore given in this case, 17 R. I. 306, 316, reviewed and affirmed.

. A testator gave all his " real and personal estate whatsoever and wheresoever to be found" to trustees in trust: then he gave certain special legacies : and then gave "all the rest and residue of his estate and effects of every kind and nature not hereinbefore disposed of" to A. The testator died before the enactment of a statute allowing the devise of after acquired realty. The trusts were held to be void.

*Held*, that the trust realty passed to the heirs at law of the testator not to the residuary devisee A.

The trustees administered the trust for nearly fifty years believing it to be a valid trust

*Held*, that they should not be charged with expenditures made by them in accordance with the will prior to the filing of the bill to avoid the trust.

BILL IN EQUITY to avoid a trust and for an account. On bill, answers and proof.

After the opinion in this case, printed 17 R. I. 306, 316, the respondents answered and the case came on for hearing on bill, answers and proof.

*Providence, November* 23, 1892. STINESS, J. At the October term, 1890, this case was before the court on demurrer

to the bill.   17 R. I. 306.   The bill is brought by the heirs of Joseph Greene to avoid a testamentary trust, and the question then raised was whether the gift to the trustees, was valid as a gift to charitable uses.   We held that it was not.   The case is now before us on bill, answer and evidence and the same question is again urged, upon an exhaustive review of authority.   It is now claimed upon the answer and evidence that a practice of hospitality has grown up in the society of Friends in freely entertaining ministers and others, members of the society, coming from a distance to attend the meetings, and that such entertainment is furnished not as simple hospitality, but in the service of religious truth and with a view to aid the religious meetings.   It also appears that the society is accustomed to pay from its treasury for the travelling expenses and entertainment of members.   Hence it is claimed that what the society itself may do may also be done by way of a charitable trust.

It is to be observed at the outset that a religious society may do many things in the administration of its own affairs, usually from voluntary contributions, which would not support a charitable trust in perpetuity.   For example, it is not uncommon for such societies to provide excursions or picnics for the children, but it could hardly be contended that a gift to trustees simply for that purpose could be sustained.   Many societies procure portraits of their ministers and place tablets or other monuments to their memory; but these things would not fall within any recognized division of charitable trusts. A society has necessarily a wide discretion in dealing with its own funds, which cannot be made the criterion of a valid trust.   This distinction is clearly brought out in *Dexter* v. *Gardner*, 7 Allen, 243, where it was held that a gift to a religious society was valid, although it might be used for the purchase and repair of burying grounds, because all the objects to which a society, by the usages of a denomination, may appropriate its funds are to, be regarded as charitable, when similar objects cannot be regarded as charitable under a secular trust.   " As the gift is to the society for its benefit it is not within the rule against perpetuities."

The respondents in the present case admit that a gift for hospitality alone does not create a valid trust ; but they contend that the trust in this case being in aid of the religious meetings of the society of Friends the gift is really to a religious use.   We do not see that we can adopt this view. The connection between the gift and the result to be secured is too indirect, too remote and too inconsequential.   Suppose a gift were to be made to furnish dinners to all persons attending at church or to provide gifts for a Christmas tree, in the hope of inducing thereby a larger attendance upon church service, we could not hold that such a gift is to a charitable use.   It would be benevolence rather than charity as this word is understood in law.   The test lies in the controlling purpose as shown by the terms and character of the gift. The practical effect of the gift in question is simply to relieve others from extending that hospitality which it is said the Friends accept as a part of their religious duty.   Its controlling purpose is to insure a continuance of such hospitality in the house where the testator and his fathers had dispensed it. It is not a gift to the society itself for its work ; nor to trustees to apply to the benefit of the society ; nor for any work of religion or public use, but for private entertainment only. It is not for ministers nor for the poor, but for all, "travelling to meetings or *otherwise* in the service of truth."   It might be administered, consistently with the terms of the will, simply for the benefit of those who are neither ministers nor in need, who might be deemed to be in any way in the service of truth, whatever that phrase may mean.   It is argued that all meetings of Friends are in the service of truth ; but this trust is not confined to those attending meetings.   Under this will the trustees might provide a home for a travelling author engaged in writing a book on the doctrines of the society, if they were satisfied that he was engaged in the service of truth, as the testator defined it ; and other ways are equally conceivable in which the trustees might follow the terms of the will in the line of pure benevolence instead of a trust for religious uses.   As was stated in *Pell* v. *Mercer*, 14 R. I. 412, 442, if a bequest can, consist-

ently with the will, be applied to other than charitable uses
the bequest is invalid.    In that case the testator gave a por-
tion of his property "to such works of religion or benevo-
lence" as his executors might select.    The court held that if
the alternative of benevolence were to be taken in its broad
sense the bequest would be invalid ; but that it was apparent
from other directions in the will that the term was used in a
restricted and narrower sense as synonymous with charity.
In the present case, however, the general intent is so speci-
fically set out that we cannot restrict the provisions to a purely
charitable use.    The trouble does not lie in the uncertainty
but in the very definiteness of the will.    The testator has
made it clear that he desired and intended to continue to
keep his house open for the reception and entertainment of
all who might be deemed to be engaged in the service of
truth, in the same manner that he and his ancestors before
him had dispensed their hospitality.    This is the main pur-
pose of the will, to which all other directions are subordi-
nated.    We are constrained to say that this is a bequest merely
for hospitality and not to a religious or charitable use.    An
expectation that this may result in some indirect and indefi-
nite way to the benefit of a religious society does not change
its essential character, nor warrant our holding it to be a
charity.    There must be some limit in the interpretation of a
trust, more definite than the fervid fancy of a judge.    If this
trust is sustainable it is difficult to conceive of a trust in any
way however remotely connected with religion or education
which would not be equally so.    We know of no definition of
a legal charity more accurate, concise and comprehensive
than that given by Mr. Justice Gray in *Jackson* v. *Phillips*,
14 Allen, 539, 556: "A charity, in the legal sense, may be
more fully defined as a gift, to be applied consistently with
existing laws, for the benefit of an indefinite number of per-
sons, either by bringing their minds or hearts under the in-
fluence of education or religion, by relieving their bodies from
disease, suffering or constraint, by assisting them to establish
themselves in life, or by erecting or maintaining public build-
ings or works or otherwise lessening the burdens of govern-

ment. It is immaterial whether the purpose is called charitable in the gift itself, if it is so described as to show that it is charitable in. its nature." We do not see how it can be claimed that this gift falls within either of these divisions of a charity, without giving a wide range to the imagination, in the hope of drawing therefrom some ulterior and possibly resultant benefit, which the testator himself has not disclosed. Undoubtedly, if a general charitable intent be disclosed in the will the gift will be supported, even though the particular mode of administering the trust pointed out by the testator may be ineffectual. But this general intent is to be found in the will itself. In the will before us we can find no such general intent. The idea of the testator was not to furnish funds for the use or benefit of any of the local or general meetings of Friends, nor for the poor among their number for fear that such beneficiaries might become apostate; but his primary and predominating purpose was.to provide entertainment in a merely private way for those who should be acceptable to.his trustees on account of their soundness in faith. The gift is not in general intent for the benefit of the society of Friends; for in the instructions to his trustees he contemplates the contingency that the society may become so largely affected by apostacy from the faith that true believers will be deprived of their membership, "and, as it were, driven into the wilderness;" but still the trustees "are to follow the original principles of truth in the application of the benefits of this trust, without regard to the outward appearance, mere name, lifeless profession, numbers or majority of such apostates." Neither is the gift for the teaching or preaching of the gospel or for any religious use other than what his trustees may deem to be comprehended in the vague expression "in the service of truth," which the answer, by substituting a conjectural motive for the thing itself, makes the equivalent of simple hospitality. But what is the "application of the benefits of this trust" which the testator directed? Nothing but the entertainment of travelling Friends whose belief is similar to his own. The many pious expressions in the will and the ardor for what he calls the truth, may lead a super-

ficial reader to mistake the pious expressions for the object
aimed at, but a close analysis shows clearly that what he was
aiming at was not the general benefit which comes from re-
ligious teaching, but a perpetuation of his own good will to
orthodox followers of the faith, whom these pious expressions
simply point out.    His desire was to put into permanent, con-
crete and literal form the sentiment of the patriarch:  "As
for me and my house we will serve the Lord."   Any resort to
the doctrine of *cy pres*, therefore, so as to turn this fund to
the benefit of the religious society or its ministers would not
only be liable to aid the teaching of doctrine contrary to his
notion of truth by a society which he was not willing to trust,
a thing which he sought with great care to prevent, but it
would be turning his bounty in a direction quite different
from the plain purpose of his will, which was merely that of
maintaining a long established hospice for orthodox travel-
ling Friends.    Should we set it apart for the poor, or for
printing religious books, we should substitute for the primary
purpose of the will a subordinate and conditional direction,
which applies only to a possible surplus after the expenses of
entertainment have been met.    In our view, the will does
not disclose a general intent for a legal charity to which we
may resort to support the trust, but only provides, in general
intent and particular direction, for a continuance of that
practice of hospitality which had become the tradition of his
house.

   Among the numerous cases cited by the respondents we find
no decision analogous in fact or principle to a trust like the
one before us.    Without attempting to consider the cases in
detail, it is sufficient to say that they are all cases where the
gifts were directly and expressly for recognized religious
or charitable uses ; for building parsonages ; for the repair
of churches ; for support of ministers ; for increasing the
salaries of those in need of assistance ; for the poor ; for the
ordinary expenses of a parish as a governing body ; or for
the maintenance of some definite work akin to the purposes
of a religious society where the gift was to the society itself.
All these objects are quite distinguishable from that contained

in the will before us.   The case which most nearly resembles the one before us is that of *Shotwell, Executor,* v. *Mott,* 2 Sandf. Ch. 46.   But in that case the trust was for ministers in limited and straitened circumstances, which is a very different trust from that which is here sought to be established. Gratuitous aid to the needy is charity, but the same thing for those not needy is benevolence.   A salary may be provided for those who perform some religious service or expenses in lieu of salary, and hence it is urged that entertainment itself may be provided ; but even so it is a very different thing from providing for the entertainment of others simply because they attend a meeting or in some other way are deemed to be " in the service of truth."   We see nothing in the present aspect of this case which leads us to any different conclusion in regard to the trusts from that declared upon the demurrer in 17 R. I. 306, 316, or which calls for any further discussion of the law relating to them.   We must therefore hold that the trusts in this will do not come within the boundaries of charitable trusts.

If the trust is invalid, the next question is whether the residuary devisee took the estate under the residuary clause of the will or whether it passed under the statute of descent. The contention in behalf of the representatives of the residuary legatee is that as the trust is invalid the gift was void and so the same as if it had not been made, and therefore the property attempted to be conveyed thereby falls into the residue of the estate.   The residuary clause was : " all the rest and residue of my estate and effects of every kind and nature not hereinbefore disposed of."   It is well settled that where a gift is made upon trusts which are void in whole or in part for illegality a trust results for the donor, his heirs or legal representatives, if the property is not otherwise disposed of; but the question remains whether, as to real estate, the trust results to the heirs or to the residuary devisee.   Perry on Trusts, 4th ed. §§ 160, 160 *a* ; *Church* v. *Church,* 15 R. I. 138.   It is to be observed that this will has practically two residuary clauses.   It starts out by giving all "real and personal estate whatsoever and wheresoever to be found," to the trustees ;

then gives certain special legacies, ending with the residuary clause above quoted. The devise might be treated as residuary in its inception, which therefore could not fall into the residue. But, taking the question in its broader aspect, we think it is clear that the residuary devisee in this case does not take upon the failure of the trust. This will was made in 1839, and the testator died in 1840, before the statute allowing the devise of after acquired real estate. Since the passage of such statutes there has been much question whether a distinction between lapsed legacies and lapsed devises still holds. However this may be there seems to be little doubt that prior to the statutes the estate descended to the heir upon a void devise. 4 Kent Comment. 12th ed. *541; 2 Redfield on Wills, 2d ed. 115; Perry on Trusts, § 160 a; 2 Washburn on Real Property, *692; 13 Amer. & Eng. Encyc. of Law, 51; Schouler on Wills, 521. This question has been so much discussed that it is not necessary now to review the cases, nor to decide upon the effect of the statute. We think the weight of authority is that the interest in the real estate, which failed under this will, passed to those entitled to the estate under the statute of descent, and not to the residuary legatee.

In the matter of account, as the complainants have so long stood by and allowed the trustees to administer the estate in good faith upon what they believed to be a valid trust, we think the trustees should not be chargeable with expenditures made by them in the proper execution of the trust as directed by the will down to the time of the filing of this bill.

---

TILLINGHAST, J., dissenting.

I am unable to concur in the opinion of my associates, in this case, and will state my grounds of dissent.

The will of Joseph Greene, together with the evidence submitted, shows that he was a very religious man, a leading member of the Society of Friends, commonly called Quakers, and exceedingly zealous for the promotion of the truth, as understood and practised by the early Friends, and that his

leading and controlling purpose in the making of his will, was to apply his estate to the support and advancement of that form of religion. So intent was he on impressing the fact upon those who should have the execution of his will, that the instrument abounds, and is even redundant with pious expressions and Scriptural quotations, setting forth in unmistakable language his religious creed and his earnest desire for its propagation. Indeed, so prominent is this feature of the will, that even a casual reading thereof, impresses one with the fact that the regnant and almost overweening desire of the testator in the making thereof, was to foster and promote the primitive doctrines of the Quaker religion.

Such being undoubtedly the testator's intention, then, the only question which arises is, did he carry out this intention by making a valid bequest to charitable uses? The fourth item of the will, which is the principal one in question, is as follows:

"My will is that after the decease of my sisters above mentioned, my clock shall continue to stand where it now does, in the southeast corner of my east front room, and shall be kept in repair by my Trustees above mentioned, or so long as they may deem proper, and practicable; and further my will is, that inasmuch as my house has been open during my lifetime, (as well as for generations back, in the lifetime of my ancestors of the same name), for the reception and entertainment of ministers and others traveling in the service of truth, so it shall continue to be a place for the reception and entertainment of such forever, in conformity with the preamble of this, my last will and testament, and in the discretion of my Trustees. And my will further is, that my west front room chamber shall be kept in constant readiness to lodge such persons as shall cross over or visit this island in the course of their labours in the gospel of Christ, and others who are not ministers, but who are traveling to meetings or otherwise in the service of truth, and that the said room be kept furnished with two good bedsteads, two beds, two bolsters and two pair of pillows, and other necessary furniture."

A charitable or pious gift is defined to be "whatever is

given for the love of God or for the love of your neighbor in the catholic and universal sense, given from these motives and to these ends, free from the stain or taint of every consideration that is personal, private or selfish." *Vidal et al.* v. *Girard's Executors*, 2 How. U. S. 127. This definition has been approved by the Supreme Court of Pennsylvania, *Price* v. *Maxwell*, 28 Pa. St. 23, 35.

Lord Camden defines a charitable gift to be, "a gift to a general public use, which extends to the poor as well as to the rich." *Jones* v. *Williams*, Ambl. 651. And this definition is approved by Chancellor Kent, *Coggeshall* v. *Pelton*, 7 Johns. Ch. 292, 294, and by the Supreme Court of the United States. *Perin* v. *Carey*, 24 How. U. S. 465, 506.

Mr. Justice Gray, in *Jackson* v. *Phillips*, 14 Allen, 539, 556, says: "A charity, in the legal sense, may be more fully defined as a gift to be applied, consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government."

A gift for the promotion of any lawful form of religion, is doubtless a valid gift to charitable uses. Perry on Trusts, vol. 2, § 701, and cases cited; Amer. and Eng. Encyc. of Law, vol. 3, p. 130, cap. "TRUSTS FOR RELIGIOUS PURPOSES," and cases cited.

The religion taught and practised by the Society of Friends, is, and always has been, recognized in this State as a lawful form of religion, and it seems to me that the bequest above set out, in so far, at any rate, as the principal object sought to be obtained is concerned, is in fact and in law what it was clearly intended by the testator to be, namely, a gift for the promotion of the Quaker religion, and hence a good and valid charitable gift. The practical effect of said bequest was to directly aid in the accomplishment of a charitable object. The furnishing of a comfortable and convenient stopping place, together with necessary subsistence, for ministers and

others of the Quaker faith, while traveling in the service of truth, was certainly promotive of that faith. It was precisely equivalent to a contribution of money, or other property of the same value to said cause.

The schedule produced in evidence[1] shows that many sums of money have been appropriated out of the treasury of the society for the payment of the traveling expenses of members, and for their entertainment while attending the meetings of the Society. This practice has existed from an early time.

---

[1] As follows:

SCHEDULE.

*From Records of Meetings for Sufferings, from 1775 to 1842.*

---

In Record Book from 1775 to 1793.

Page 70. Moses Farnum, one of the Friends appointed to provide horse keeping at the Yearly meeting held in the 6th mo., last, reports that the cost of horse keeping at Smithfield, upper house, amounts to about seven pounds, ten shillings, which sum this meeting desires the Yearly meeting's Treasurer to pay to George Arnold in order that he may discharge the debt.

Page 85. At a Meeting for Sufferings held at Providence the 10th day of the 8th mo. 1778.

The committee appointed in the 4th month reports that the cost of horse keeping at Smithfield, upper house, in the time of the last Yearly meeting amounts to three pounds, six shillings, which sum this meeting desires the Yearly meeting's Treasurer to pay David Buffum in hard money.

Ninth day of the 6th mo. 1779, Smithfield. This meeting directed the Yearly meeting's Treasurer to pay Caleb Aldrich sixty pounds in full for his account of horse keeping this Yearly meeting.

At a meeting for Sufferings held in Smithfield lower house the 7th of the 7th mo. 1779, David Buffum informs this meeting that the remaining expenses for horse keeping at our late Yearly meeting is sixty-three pounds, twelve shillings, L. M., which the Treasurer of the Yearly meeting is directed to pay him.

At a meeting for Sufferings held at Providence the 8th day of the 5th mo. 1780:

This meeting appoints Isaac Lawton and Jacob Mott to procure sufficient horse keeping for friends that attend it (*i. e.* the Yearly meeting at Newport).

At a meeting for Sufferings held in Providence, 13th of 11th mo. 1780:

The committee appointed in the 5th month to procure accommodations for Friends at the Yearly meeting, reported that they had settled the accounts and paid the same amounting to fifty-two pounds, ten shillings, twopence, lawful money, as by the account on file, which sum the Yearly meeting's Treasurer is directed to pay the Treasurer of this meeting, he having paid the same out of money in his hands.

At a meeting for Sufferings held in Providence the 18th of the 5th mo. 1782:

It appearing to this meeting that from the reduced state of Friends at Newport, it will be necessary that further provision be made for the accommodation of

These funds were not funds of individual donors, who could do as they chose with their money, but were charitable funds, held in the treasury, for the purpose of being applied to the religious or charitable uses of the Society. It cannot be contended that the practice of the society observed during nearly all its history, was illegal, nor that the Meeting for Sufferings, composed as it always was of the leading members of the Society, was guilty of a breach of trust, and of a misapplication of the funds of the Society. And if it was lawful to

---

Friends at the Yearly meeting than the members there can reasonably provide, Jacob Mott . . and others . . are appointed a committee to take up such a number of houses as they judge will be sufficient to victual and lodge the Friends that may attend the Yearly meeting, and to furnish the families with money for necessary provisions and lodgings, and to do and transact that business with the assistance of other Friends thereaway whom they may call upon.

At a meeting for Sufferings held at Providence the 12th day of the 5th mo. 1783 : .

Our Friends Jacob Mott and Joseph Mitchell are appointed to take the necessary care for the accommodation of Friends at the Yearly meeting, to call on suitable Friends at Rhode Island for assistance, and the Treasurer of the Yearly meeting for money, and to conduct the matter according to the directions of the committee for this service last year, they to report to this meeting after the Yearly meeting as soon as may be.

Fourth mo. 1784. Fifteenth day, met by adjournment.

This meeting understanding that two Friends from this Yearly meeting with proper certificates for traveling into foreign parts in the service of truth, not having been provided with the necessary means of defraying the expenses of their passage, Friends of a neighboring yearly meeting have been under the necessity of advancing the same for them, whereupon Moses Brown and Thomas Arnold are directed to receive the amount thereof, when known, of the Yearly meeting's Treasurer, and transmit the same to those who have advanced it for them.

Ninth of 5th mo. 1785 :

Our Friends Thomas Aldrich (and others), are appointed to make such frugal provisions for Friends and pasture for horses, for the ensuing Yearly meeting on Rhode Island, as they shall judge necessary, and to lay their amount of the expense before a future sitting of this meeting; and the Yearly meeting's Treasurer is directed to furnish them with such a sum of money as they think necessary for the purpose.

At a meeting for Sufferings held at Providence the 13th of the 3d mo. 1786 :

This meeting having taken into weighty consideration the subject of making provision for holding the next Yearly meeting, also the state of the treasury (Note—a school at Portsmouth has been established,) it is our sense that it is not advisable to make provision for entertainment as of late years, and the Monthly meeting of Rhode Island is desired to make such provision for pasturing of horses as formerly, nevertheless to lay an amount of the expense thereof if they think

apply the money of the Society for the above named purposes, then it was equally lawful for the testator to make a similar application of his property.

If the Yearly Meeting could legally pay out of its treasury the sums requisite for the reception and entertainment of ministers and others attending the meetings, surely Joseph Greene, the testator, could offer the hospitalities of his estate for the reception and entertainment of ministers and others, traveling in the service of truth or attending the meetings of

---

proper before the next Yearly meeting. And the clerk is directed to forward a copy of this Minute to each of the Monthly meetings in Rhode Island quarter

At a meeting for Sufferings held at Dartmouth the 11th of the 10th mo. 1786 ;

Shubael Coffin and Thomas Richardson Robinson, the Yearly meeting's committee to accompany our friend John Townsend, made report in writing. as follows: " According to appointment of the Yearly meeting held at Newport, on Rhode Island, on the 6th mo. last, we have accompanied our esteemed friend John Townsend in performing his religious visits to Nova Scotia and the island of St. Johns, and herewith enclose an account of the expenses and charges aris. ing on the voyage, amounting to sixty-six pounds, ten shillings, twopence ; the journal of our particular travels and the labors and religious services performed by our said Friend we also enclose for the Meeting's perusal and satisfaction."

The Yearly meeting's Treasurer is directed to pay the amount of the said expenses as it comes into his hands from the several Quarterly meetings.

At a meeting for Sufferings held at East Greenwich for New England, the 11th of the 4th mo. 1787 :

The making provision for horse pasture during the sitting of the Yearly meeting, coming under consideration and this meeting not having succeeded in our request to Rhode Island Monthly meeting last year, of making provision as formerly and as circumstances appear there is not a prospect of such an application succeeding at this time, we think best to recommend the subject to the particular attention of Rhode Island Quarterly meeting and to desire them to make the necessary provision for horse keeping during the next yearly meeting, and also to endeavor to have the case of the lot heretofore used for that purpose looked into, stated and settled with Rhode Island Monthly meeting or have the same laid before the yearly meeting in order that the diversity of sentiments respecting the right to the use of said lot be removed by settlement thereof by some suitable Friends abroad or otherwise as best wisdom may direct, and the clerk is directed to lay a copy of this minute before Rhode Island Quarterly meeting to-morrow.

At a meeting for Sufferings held at Portsmouth the 6th of the 6th mo. 1787 :

The visit of our Friend John Townsend and the committee of the Yearly meeting who accompanied him to Nova Scotia, etc., having been under consideration and their journal read up to our satisfaction, the same is referred to the Yearly meeting, and as we are informed that the meeting for Sufferings at Philadelphia has paid thirty pounds L. M., towards the account of the expenses, the Yearly

the Society. If one is a valid appropriation then so is the other. It is impossible for me to draw any sound distinction between the two cases. See *Magill* v. *Brown*, Brightley, Pa. 346, note; *Wright* v. *Trustees of Methodist Episcopal Church*, Hoffman, Ch. 202.

In *Shotwell, Executor* v. *Mott*, 2 Sandf. Ch. 46, it was held that the income of a trust fund could be distributed and divided under the direction of the New York Yearly Meeting of Friends, called Orthodox, unto and among such orthodox

---

meeting's Treasurer is directed to settle the remainder, being thirty-six pounds, ten shillings, twopence, if not already done, as soon as may be.

At a meeting for Sufferings held at Portsmouth on Rhode Island for New England, the 8th day of the 6th mo. 1791:

It appearing necessary to this meeting that some provision be made to accommodate Friends at the ensuing Yearly meeting, Daniel Howland, Jun., Wm. Rotch, Jun., Jethro Mitchell, Levi Hunt and Wm. Almy are appointed to take the necessary care in that respect and report the expense thereof to this meeting as soon as the same is ascertained.

At a meeting for Sufferings held at Newport the 15th of the 6th mo. 1791:

The committee appointed to make provision for the accommodation of Friends at the Yearly meeting report that they have expended twenty-six pounds, five shillings, three and a half pence, which the Treasurer is desired to pay to Wm. Rotch, Jun.

At a meeting at Newport, 12th of 6th mo. 1792:

The committee appointed to make some provision for the accommodation of Friends at the Yearly meeting report that they have attended to that service and that the amount of the expenses thereof including two pounds, which remained unpaid of the expense of last year, is thirty-seven pounds, fourteen shillings, ninepence, which the Treasurer of the Yearly meeting is directed to pay to Jethro Mitchell, and the clerk is desired to give him a copy of this minute.

*From Records of New England Meeting for Sufferings—in the Record Book from 1793 to 1842.*

1794.

Page 4. An account of the expenses of making provision for the accommodation of Friends at the time of the last Yearly meeting, exhibited by Obadiah Williams and by him acknowledged to be received of William Rotch, Jun'r was presented to this meeting, the amount thereof being thirty-seven pounds, one shilling, eight pence, the Treasurer of the Yearly meeting is directed to repay William Rotch, Jun'r or order. ·

Page 15. The committee appointed to make the necessary provision for the accommodation of Friends at the late Yearly meeting, report the expenses to have been forty-two pounds, five shillings, which the Treasurer is directed to pay Wm. Rotch, Jr.

Page 21. For the accommodation of Friends during the Yearly meeting at

ministers of said Society, in limited and straitened circumstances, especially those who travel in the ministry, as the said meeting by its Committee should for that purpose name and designate. The following illustration given by the counsel for the respondents in their brief, is apt and to the point.

"Suppose two duly accredited ministers from the New York Yearly Meeting are on their journey to the New England Yearly Meeting at Newport. The trustees of the fund above mentioned have furnished one with money for his journey as they lawfully might, under the above decision. They cross

---

Newport, our Friends, David Buffum and Samuel Thurston are appointed for that service and to call for such further assistance of Friends as may be necessary.

Page 22. Provision made for the accommodation of Friends amounted to sixty pounds, six shillings, ninepence.

Page 41. 1797. Paid for the accommodation of Friends at Yearly meeting, sixty-two pounds, one shilling, sevenpence.

Page 54. 1798. Wm. Rotch in behalf of the committee appointed at last Yearly meeting, to make provision for Friends who might be engaged to travel on a religious account as is therein expressed, reported an account of those expenditures last year, which being approved, the balance of two hundred seventy-nine pounds, the Treasurer is directed to pay to him or order.

Page 61. 1798. David Buffum, one of the Yearly meeting's committee for that purpose, reported an account of the expenses that had accrued under the minute of the Yearly meeting, for making provision for Friends who travel on a religious account, amounting to fifty-eight pounds, fourteen shillings, which being approved, the Treasurer is directed to pay the same to him or his order.

Page 83. 1800. Thomas Rotch, one of the Yearly meeting committee for making provision for Friends who might travel on a religious account agreeably to said conclusion, present an account of $127.66, which being approved, the Treasurer is directed to pay the same.

Page 109. Committee at liberty to draw on Yearly meeting's Treasurer to the amount of $300 for the accommodation of Friends.

Page 113. 1803. Cost of making provision for Friends during Yearly meeting, $453.85.

Page 154. 1811. Expense of accommodating Friends at Yearly meeting, $798.25.

Page 185. 1816. An account was presented from Abishai Bunker, one of the committee appointed at the Yearly meeting to assist in making provision for the accommodation of the Friend whose concern to make a religious visit to Friends in Europe, was approved by that meeting, amounting to twenty-one dollars and eighty-seven and a half cents, expense attending a passage from Nantucket to New York, in the 7th month last, to qualify her to obtain a passage to Liverpool, which the Treasurer of the Yearly meeting is desired to pay to Sam'l Rodman, with the foregoing amount of $12.50 for printing the Yearly meeting Epistle. (Page 199, 200.) Additional expenses of the Friend's passage to Europe, $182.17.

the ferry from the west side on to Conanicut. The one who has the money stops at a house near the Greene farm for the night and pays his fare out of the funds furnished him. This is all legal and proper and the New York Court of Chancery has so decided. The other minister has no trust funds, he must look for chance hospitality or pay for his night's lodging from his own means. Suppose he stops at the Greene farm and is received and entertained without charge under the provisions of the Greene will, this is regular and valid, too.

"If the one Board of Trustees could lawfully furnish a minister with money to pay for a night's lodging, certainly the other Board of Trustees could furnish lodging and board itself to the minister without compensation."

I fail to see that there is any real distinction in point of law between the two cases. The means by which the cause of religion may be fostered and promoted in the earth are innumerable. But amongst them all, none is more potent than material aid bestowed upon those who, foregoing the pleasures and emoluments of a secular life, devote their time and energies to the dissemination of religious truth. And why may not this aid be furnished by providing for the necessary subsistence and entertainment of those who are traveling in the service of truth, as well as by building churches and colleges, paying the salaries of missionaries, or contributing in any other material way to the cause of religion? The object sought and obtained in each case is the same. One man accomplishes it by giving his money, the other by giving the use of his house and furnishing the necessary subsistence for the minister, overseer or missionary, while engaged in the prosecution of his work.

An examination of the evidence submitted, regarding the organization, discipline and practices of the Society of Friends, throws much light upon the construction and proper understanding of this will, and particularly of that part thereof now under consideration. It appears therefrom that the duties devolved upon those who were specially charged with the management of the affairs of the Society, were many and varied, including, as they did, not only the oversight of

the Society and of the individual members thereof, in spiritual and religious affairs, but as incidental thereto, to a large extent, in civil and secular affairs as well, and that the performance of these duties, necessitated frequent journeys to and from the places of meeting, (several of which it should be remembered, were in the neighborhood of the testator's home, and that in going to and from the same the main line of travel passed near his house,) and much time necessarily spent while holding said meetings.  Moreover, it is a fundamental doctrine of the Society of Friends, that no minister, elder or overseer thereof, shall be entitled to compensation, for the services rendered by him.  The hospitality provided by the testator, for such persons, was therefore a most efficient adjunct to the dissemination of the truth.  But it was evidently not hospitality, as such, which the testator intended to provide, but hospitality as a means to an end; the hospitality being entirely subsidiary to the accomplishment of the main object, the propagation of the *"truth."*  Hospitality to the servant, not for the servant's sake but for the sake of the Master whom he served, and to enable him to render the service.  In short, the hospitality provided for was merely one of the agencies, which the testator directed to be employed, for the dissemination of the truth, *charitable* hospitality. The motive which inspired the gift was not personal or selfish, but pious and charitable.  The language of the testator leaves no doubt as to this.  He says:  "And my will and intent is, that such part of the estate which has been (thr'o divine favor) bestowed on me, and which is hereinafter described, shall according to the directions, limitations, and instructions hereinafter given, *be singly, strictly and faithfully applied only in the service of the same,* and (as far as may or can be the case,) to the honor and spread thereof, and to the comfort and relief of such persons as are and shall be true and practical believers in, living witnesses of, and faithful standard bearers and testimony bearers to and for the same divine, eternal truth, above mentioned, forever."

From his standpoint the acceptance of the truth as he understood it was the *sine quâ non* of all right living.  To him

there was evidently but one true religion, and that was the primitive Quaker religion. Whoever labored for its advancement was laboring "*in the service of truth.*" The reception and entertainment which the testator provided for in his will, was for those "*traveling in the service of truth.*"

And there can be no question as to what he meant in the use of this term. He uses the word "truth" as the Quaker writers use it, as a general word, comprising the whole system of faith, doctrine and practice held or observed by the Society.

That a gift for hospitality alone does not create a valid charitable trust, no one will deny. The mere exercise of benevolence and liberality is not charity. But while this is so, it does not follow that charity may not so underlie, permeate and control hospitality, as effectually to transform it into charity itself. In other words, where it is clear, as in this case, that the testator intended only the accomplishment of a charitable end by the use of hospitality, and in fact accomplished that end thereby, then the hospitality becomes a charity, or at least a charitable hospitality, which is practically the same thing. The gift became and was, in the circumstances of the case, a gift to a definite charitable use, and hence was a valid trust. See *Re Hewitt* v. *Hudspeth*, 49 Law Times Reports, N. S. 587.

In *Pell* v. *Mercer*, 14 R. I. 412, 443, Chief Justice Durfee, in construing the bequest made by the testator "to such works of religion or benevolence as my executors, after full consideration, shall select," said: "It does not follow, however, that the bequest is invalid because the word 'benevolence' is used; for the question is a question not of language but of meaning; and it may appear by the context of the will, or by the will taken as a whole, that though the word 'benevolence' was used, the only thing which was intended to be denoted by it was charity. If it be clear that this was the meaning, the will must be executed in accordance with it."

But it is objected that the court cannot enforce such a trust, because it cannot determine who would be entitled as true believers, within the meaning of the will, to the benefits

thereof. I fail to see any serious difficulty in this respect. The declaration of trust referred to in the will contains suggestions concerning the class of persons entitled to the hospitality of the testator's farm, or other benefits of the will. The declaration seems to establish rules as to the eligibility of the beneficiaries of the trust. The rules are simple. The benefits of the trusts are for those who hold to the ancient principles and doctrines of the faith, and the testator refers to certain books and especially to George Fox's Journal, Robert Barclay's Apology, his Catechism and Confession of Faith, and his "Anarchy of the Ranters, etc.," as works containing the principles and doctrines of the Society.

In other words, the benefits of the trusts, are for that class of Quakers who are orthodox and holders and supporters of the ancient principles of the order. The object is sufficiently definite so as to shut out all arbitary discretion in the trustees.

Under the decisions relating to charitable trusts it seems to me that it is perfectly easy for a board of trustees to select the individuals who should receive the benefits of the will, and that a court of chancery could readily and without difficulty regulate and supervise the acts of the trustees. To determine who are orthodox Quakers under the will of the testator would be no more difficult than to determine who are orthodox Baptists, Congregationalists, Episcopalians or Presbyterians of the present day. Courts of law are presumed to have the ability, by the aid of testimony, to settle all questions brought properly before them relating to human rights and property. They have the right to inquire into and pass upon the faith, doctrines and practices of a church or of any member of a church. This power has never been doubted. Questions have arisen as to whether the judgments of the ecclesiastical courts are binding and conclusive upon the civil courts, but no question is made of the power of a court in cases where not so limited, as well as a strictly ecclesiastical court to act in these matters.

*Hendrickson* v. *Decow*, 1 N. J. Eq. 577, decided in 1832, is a leading case upon this class of questions. The nominal question in that case was as to the foreclosure of a mortgage.

There had been a division in the Society of Friends into two branches, the one called Orthodox Quakers and the other Hicksite Quakers; and a question arose in the case as to the title of the mortgage.   In the course of his opinion, Ewing, .C. J., says, "I hope to be able to continue and close this investigation, without inquiry into religious faith or opinions. Not that I doubt the power of this court.   For while I utterly disclaim the idea that this court, or any court, or any human power, has a right to enforce a creed, or system of doctrine or belief, on any man, or to require him to assent to any prescribed system of doctrine, or to search out his belief for the purpose of restraining or punishing it in any temporal tribunal, I do most unqualifiedly assert and maintain the power and right of this court, and of every court in New Jersey, to ascertain, by competent evidence, what are the religious principles of any man or set of men, when, as may frequently be the case, civil rights are thereon to depend, or thereby to be decided.   In a greater or less degree it is done daily."   1 N. J. Eq. 633.

And Justice Drake, in his opinion in the same case, page 670, says: "This court may, surely, inquire into the badges of distinction by which the Society of Friends are known; and if they are characterized by established doctrines, we may inquire what those are, and whether they belong to one, or both of these parties.   This power is distinctly laid down, in a recent case before the House of Lords, in which Lord Chancellor Eldon says: 'It is true the court cannot take notice of religious opinions, with a view to decide whether they are right or wrong, but it may notice them as facts, pointing out the ownership of property.'   1 Dow, 1; 2 Jac. & W. 248; 3 Meriv. 412, 419; 7 Serg. & R. 460; 3 Dessaussure, 557."   The Justice further says, p. 679: "If a fact be necessary to be ascertained by this court, for the purpose of settling a question of property, it is its duty to ascertain it.   And this must be done by such evidence as the nature of the case admits of."

And Justice Drake in his opinion inquires minutely into the

peculiar faith and doctrines of the Quakers, and into the mode of their organization; *vide* pp. 671–677.

In *Potter & others* v. *Thornton*, 7 R. I. 252, the trustees must ascertain what are the modes and ways, rules and establishments of the sect or denomination of christians called Baptists or Antipædo Baptists. They must inquire into the principles of the doctrine of Christ as laid down in the first and second verses of the sixth chapter of St. Paul's Epistle to the Hebrews, and the trustees must find a society holding these views who have adopted the above modes and ways, rules and establishments, and who hold strictly to the above principles. In case proceedings should be commenced against the trustees charging them with a misapplication of the trust estate it would be necessary for the court to inquire into these questions, and if there was a society worshipping in the meeting-house in question it would have to inquire into the faith of those worshippers, so as to determine whether the faith was in correspondence with the terms of the original trusts.

In *Pell* v. *Mercer*, *supra*, it would be necessary for the trustees under the fourth section of the Mercer will "to inquire into the purposes and uses of religious worship," according to the forms of the Protestant Episcopal Church in the United States of America.

It would be necessary for the trustees under the tenth section of the Mercer will, to select such poor students as have passed through some of the public schools with the best reputation for character and ability.

And upon any question concerning the administration of the trust being made, the court would be bound to inquire into the above matters.

See also *Derby, Executor,* v. *Derby et als.,* 4 R. I. 414; *Rhode Island Hospital Trust Co.* v. *Olney,* 14 R. I. 449; *Going* v. *Emery,* 16 Pick. 107; *Earle et al.* v. *Wood et als.,* 8 Cush. 430; *Shotwell, Executor,* v. *Mott,* 2 Sandf. Ch. 46; *Camp* v. *Crocker's Adm'r,* 54 Conn. 21; *Exc'rs of Burr,* v. *Smith et al.,* 7 Vt. 241; *Saltonstall et al.* v. *Sanders et al.,* 11 Allen, 446; *Chambers* v. *City of St. Louis,* 29 Mo. 543; *Sowers* v. *Cyrenius,* 39 Ohio St. 29; *Hesketh* v. *Murphy,* 36 N. J. Eq.

304; *Nash* v. *Morley*, 5 Beav. 177; *Morville* v. *Fowle*, 144 Mass. 109; *Claypool* v. *Norcross*, 42 N. J. Eq. 545; *Miller* v. *Teachout*, 24 Ohio St. 525; *Attorney General* v. *Wallace's Devisees*, 7 B. Mon. 611; *Lamb et al.* v. *Cain et al.*, 129 Ind. 486, 509, 510.

A bequest which was evidently intended by the testator to be for a charitable use will be sustained if possible; and it will never be construed to be absolutely void for uncertainty, but from necessity. If it is possible to reduce it to a certainty, it will be sustained. " *Ut res magis valeat quam pereat.*" *Bristol* v. *Ontario Orphan Asylum*, 60 Conn. 472; *Piper* v. *Moulton*, 72 Me. 155, 159; *Almy* v. *Jones*, 17 R. I. 265; *Pell* v. *Mercer; supra.*

In *Jackson* v. *Phillips, supra,* Judge Gray says: " By the law of this commonwealth, as by the law of England, gifts to charitable uses are highly favored, and will be most liberally construed in order to accomplish the intent and purpose of the donor; and trusts which cannot be upheld in the ordinary cases, for various reasons, will be established and carried into effect when created to support a gift to a charitable use."

Moreover, in the case at bar, the fact that the trusts created by the will in question have been administered for more than half a century without any difficulty, so far as appears, is certainly pretty good proof that they are sufficiently definite to be capable of execution.

But even if it shall be found to be impracticable, as contended by the complainant, to carry out the particular intention of the testator, yet, it being perfectly clear from the will, that there was a general charitable intention, the failure of the particular intention, will let in the general intention, and the court can exercise its *cy pres* power and order a new scheme to be devised for the purpose of carrying out such general charitable intention. *Pell* v. *Mercer, supra*; *Biscoe* v. *Jackson,* L. R. 35 Ch. Div. 460; Tyssen on Charitable Trusts, p. 441. The trusts relating to the clock and graveyard, if void, are of that class of cases wherein the amount required for the support thereof, being ascertainable, falls into the residue for the benefit of the other charitable trusts of the will. The other

trusts have already been held to be good by this court.  *Kelly*
v. *Nichols*, 17 R. I. 306.

For the reasons above given I am of the opinion that the
trusts of said will are valid and operative, and should be
sustained.

In this opinion I have quoted freely from the respondents'
brief, as it contains in my judgment a correct statement of
the law applicable to the case.

*Charles E. Gorman & Patrick J. Galvin*, for complainants.

*William P. Sheffield, William Gilpin, Thomas C. Greene,
& Arnold Green*, for respondents.