THE TRUSTEES IN TRUST FOR THE FIRST SOCIETY OF THE METHODIST EPISCOPAL CHURCH OF NEWARK V. JOHN CLARK AND JAMES CLARK.

*Religious societies—Corporate acts—Trusts for charitable uses—Costs on dismissal of bill.*

A certificate from the preacher in charge of a Methodist church society, drawn in accordance with the discipline of the church and appointing certain named persons trustees of the society, was *held* sufficient to constitute them trustees to hold society property.

An act cannot be treated as the exercise of a corporate franchise unless it appears that it distinctly pertains to corporate powers, and not, as well, to those of a partnership or unincorporated association. It must in itself imply an assertion of corporate existence.

A religious organization may, without being a corporation, maintain regular worship, contract debts in its own name, be represented in the annual conference, receive members to its communion, and try and expel them for misconduct.

Property held for an unincorporated religious association is held by trustees.

A bill to quiet title rests on actual possession by complainant, of the disputed premises, and is sustained on the ground that he has no other means of bringing his title to adjudication. It cannot be maintained if he is out of possession, or if he received it from his opponent only on an agreement that no legal rights should be affected by his occupancy.

Possession is not absolutely necessary to enable one to maintain a bill to relieve his title to land from an encumbrance.

A perpetual trust for a particular purpose and with no power of alienation in the trustees, leaves no power of alienation in any one else, and is invalid.

Trust estates are subject to the statutory prohibition against suspension of the power of alienation. Comp. L., § 4124.

The Statute of Charitable Uses is not in force in Michigan.

Trusts for charitable uses are not distinguished in Michigan from others, and their validity depends on the same rules.

Costs of the lower court are discretionary on dismissal of a bill and are properly refused if the defendants' conduct invited the litigation, as by the recognition of an invalid trust upon which the controversy rested.

Appeal from Lapeer.    Submitted June **3.**    Decided October 28.

BILL TO QUIET TITLE and set aside a mortgage.    Defendants appeal.

*S. B. Gaskill* and *William Newton* for complainants. A grant to individuals for an unincorporated church vests as soon as it becomes a corporation with legal capacity to take it, *Miller v. Chittenden,* 4 Iowa, 252; *Trustees of the South Baptist Church v. Yates,* 1 Hoffman Ch., 142; a defendant who has acted with a corporation *de facto* cannot allege any defects in organization, *Steam Nav. Co. v. Weed,* 17 Barb., 378; *McFarlan v. Ins. Co.,* 4 Den., 392; *Wardens v. Lovett,* 1 Hall, 191; *Vernon Society v. Hills,* 6 Cow., 23; *Palmer v. Lawrence,* 3 Sandf. Sup. Ct., 161.

*M. E. Crofoot, A. C. Baldwin, W. W. Stickney* and *J. M. Wattles* for defendants in error.    The certificate of the organization of a religious society must substantially follow the statutes and state all necessary facts, and be under seal and sworn to or acknowledged, *Ferraria v. Vasconcelles,* 23 Ill., 456; *Kulinski v. Dambrowski,* 29 Wis., 110; an unincorporated community cannot purchase and take property in succession, *Bundy v. Birdsall,* 29 Barb., 34; *Jackson v. Cory,* 8 Johns., 385; *Hornbeck v. Westbrook,* 9 Johns., 73; *Owens v. Missionary Society,* 14 N. Y., 380; *Attorney General v. Utica Ins. Co.,* 2 Johns. Ch., 371; *Meth. Society v. Bennett,* 39 Conn., 293.

COOLEY, J.    The chief purpose of the bill of com-

plaint in this cause is to quiet the title of complainants to a certain parcel of real estate of which they claim to be in possession, and upon which is situated a house of worship. For further relief they ask that a certain mortgage which has been given to the defendant John Clark upon the premises be set aside. The following is a statement of the facts from which the legal controversy arises.

On the 26th day of February, 1853, apparently in contemplation of the organization at Newark of a religious society in connection with the Methodist Episcopal Church of the country, Henry N. Brown, a minister of that church, executed the following certificate:

"To all to whom it may concern: This is to certify that I, Henry N. Brown, preacher in charge of Lapeer Circuit, Michigan Conference of the Methodist Episcopal Church, have this day appointed, according to the discipline of the said church, and do by these presents appoint, George Clark, Sr., George Clark, Jr., James Clark, Thomas Clark and Thomas Walker, trustees of the First Society of the Methodist Episcopal Church of Newark, township of Lapeer, Lapeer county, State of Michigan. Dated Lapeer, Michigan, February 26, 1853. HENRY N. BROWN, preacher in charge."

This certificate seems to have been in strict conformity to the discipline of the church at that time in force, and was no doubt sufficient to constitute the persons named trustees to hold society property. That discipline declared that "trustees for holding church property" should be constituted by the appointment of the preacher in charge or the presiding elder of the district. It also provided that "in future we will admit no charter, deed or conveyance, for any house of worship, to be used by us, unless it be provided in such charter, deed or conveyance that the trustees of said house shall at all times permit such ministers and preachers belonging to the Methodist Episcopal Church as shall from time to time be duly authorized by the general Conference of the ministers of our church, or by the annual conferences, to preach and expound God's holy word, and to execute

the discipline of the church, and to administer the sacraments therein according to the true meaning and purport of our deed of settlement."

The discipline also contained a form for a deed to trustees for the use of the church, but it is not material to recite it.   All the provisions of the discipline are applicable to trusts in the hands of individuals trustees for the use of the church, though they might easily be conformed to the case of conveyances made directly to society incorporations.

On the same day that Mr. Brown appointed the trustees, John Clark and Elizabeth his wife conveyed to the trustees and their successors in office a half acre of land "in trust that they shall erect and build or cause to be erected and built thereon a house or place of worship for the use of the members of the Methodist Episcopal Church of the United States of America, according to the rules and discipline which from time to time may be agreed upon and adopted by the ministry and preachers of the said church at their general conference in the United States of America, and in further trust and confidence that they shall at all times forever hereafter permit such ministers and preachers belonging to the said church as shall from time to time be duly authorized by the general conference of the ministers and preachers of the said Methodist Episcopal Church, or by the annual conference, to preach and expound God's holy word therein."   This deed was recorded May 12, 1853, and a house of worship was erected upon the land described in it, mainly from the contributions of the trustees and members of their families, though small sums were contributed by others.

After the house of worship was erected, it was used for the purposes of the Methodist Episcopal Church, without, so far as we are informed, any dispute or controversy respecting the right, until some time in the year 1866.   It was also at times used for the religious meetings of other denominations with the consent of the

trustees, and we have no information of any want of harmony between the trustees and the society.

On the first of November, 1866, however, for reasons not sufficiently explained, James Clark, Thomas Clark and Thomas Walker, three of the trustees, got together and assumed to audit and allow claims in favor of those who had contributed to the erection of the house of worship, and to execute a mortgage on the church lot to John Clark for moneys to meet these allowances and to make certain necessary repairs. The amount of the mortgage was $1456.79. When the existence of this mortgage was made known, James Clark and Thomas Clark, who were members of the church, were brought to trial on a charge of immoral conduct connected with the transaction, and were expelled. Thereupon the Clarks, claiming title to the lot, proceeded to close the house of worship against the church. Rev. A. R. Bartlett was then officiating as pastor for the society, and on one occasion he was locked out of the house and preached to his assembled congregation from the steps in front of it. Subsequently an arrangement was made which is explained by Mr. Bartlett as follows: "I proposed to the defendants that as they claimed title and as the trustees of the church claimed title, they, the defendants, should refrain from interrupting services, take off the irons they had put on the doors, and that we should go there when we pleased; that we should not ask them to go there, and that they should not ask permission of the trustees to go there, and that the occupancy of the church should not be to the prejudice of either party; and if they would consent to these conditions, we would refrain from the further prosecution for disturbances of our meetings previous to that. The defendants claimed title to the property, and the right to close the house. *    * The defendants assented to the propositions I made to them." This seems to have been in October, 1867. It incidentally appears from the record that there was then a suit pending against defendants for disturb-

ing religious meetings in the house, and Mr. Bartlett says: "It was agreed that the trial should go on and the question of title should be decided in a court of law, and if it was decided that the title was in the defendants, the trustees would let it alone, and if the title should be decided to lie in the trustees, the defendants should let it alone, and that the keys should be surrendered to the party having the title." The suit at law we understand to have terminated before this bill was filed, but we are not informed what was decided by it, and as neither party claims anything under it, and it is only mentioned by bare allusion, the inference is that nothing important to this controversy was decided.

Another witness speaking of the arrangement respecting the occupation of the house, to which Mr. Bartlett testifies, says: "It was agreed that the obstructions should be removed, and the church occupied by each party without prejudice to either party." It is undoubted that when this arrangement was made the defendants had possession of the house; whether rightfully or wrongfully we do not now decide.

In filing this bill the complainants claim to do so in a corporate character; and it now becomes important to know how they acquired that character.

The bill avers that complainants are a corporation "duly organized under and by virtue of the laws of the State of Michigan 'Of Religious Societies,' chapter sixty-eight of the Compiled Laws, and the acts amendatory thereto, including An act to provide for the appointment of trustees in certain cases, approved February 17, 1857, and other acts amendatory of said chapter and the laws relating to religious societies." The reference here is to the Compiled Laws of 1857. The earliest law embraced in that chapter under which a religious society could be incorporated was the act of February 13, 1855, and from the reference to the act of February 17, 1857, we are to understand, we think, that the organization relied upon

took place after that date. But neither in the bill nor by the testimony are we informed of any proceedings taking place between the time when Mr. Brown gave the certificate already recited and the giving of a somewhat similar one by Mr. Bartlett in 1868, as hereinafter shown, which could operate as an incorporation, or have any tendency to show that an actual incorporation had taken place within that period.

It is however provided by an act passed in 1869—Comp. L., 1871, § 3089—"That whenever any religious society or corporation shall have exercised the franchises and privileges of a corporation for the term of ten successive years, the same shall be presumed to have been legally organized in pursuance of the laws of this State." Complainants claim the benefit of this provision, and are entitled to it if they show that they come within it. Unfortunately we do not find in the record the evidence that they had exercised the franchises and privileges of a corporation for the period named, or for any period whatever except since the certificate given by Mr. Bartlett created a corporation, in fact, as will be presently shown.

Before any act can be accepted and treated as the exercise of a corporate franchise or privilege, it must be made to appear that it is something which distinctly pertains to corporate powers; it must not be an act ambiguous in itself and which as properly belongs to a partnership or to an unincorporated association of persons. *Fredenburg v. Lyon Lake Church,* 37 Mich., 476. It must be something which in itself implies an assertion of corporate existence; that shall inform those who know of it that corporate powers are claimed, so that the public authorities, if they dispute the fact may take proceedings to have it tried; otherwise a corporation, which must owe its franchises to the grant of the state, might come into existence by mere lapse of time, without a grant, and without the previous knowledge of the public or of the authorities, that anything was being done or asserted that implied a claim of such franchises. The

purpose of the statute is to put upon those who might be disposed to deny the incorporation, the necessity of doing so by effectual proceedings within a reasonable time, and not suffer it to be delayed until the evidences may be lost by the death of those who may know the facts, the loss of papers or other proofs; and it is a very reasonable statute with a commendable purpose in view. But it can have no application where no distinct claim or user of corporate rights appears.

Whatever may be the franchises and privileges of a corporation they must have this peculiarity, that they must be franchises and privileges that an unincorporated collection of people cannot possess or enjoy. In this case it is not shown that the religious body represented by the complainants has been in the possession or enjoyment of any such franchises or privileges. There has been a religious organization which has supported regular worship, debts have been contracted in its name, it has been represented in the annual conventions or conferences, it has received members to its communion and it has tried and expelled those accused of misconduct. But these are things which unincorporated religious societies have been accustomed to do from the foundation of the Christian Church to this day, and there is nothing in any one of them which can be regarded as an assertion of corporate existence or authority. A church primarily is nothing but a voluntary association of persons for religious worship; and for its main and distinctive purpose corporate powers are not important. Indeed the church as such is not usually incorporated, but the corporation is an associate body, composed of the congregation who may or may not be religious persons, and who take on corporate powers for convenience in holding and transferring property, entering into contracts, etc. Where there is no incorporation those who deal with the church must trust for the performance of civil obligations to the honor and good faith of the members, whereas in case of incorporation they would deal with a legal body capa-

41 MICH.—93.

ble of binding itself. And where there is no incorporation property must be held for the church by trustees, as was intended here.

There is, however, distinct evidence that in 1858 proceedings were taken to form a corporation, which were effectual. On the sixth day of May of that year Mr. Bartlett, as pastor in charge, executed under his hand and seal and acknowledged in due conformity to the statutes of 1855 and 1857 a certificate of the appointment of Eli Collins and four others as trustees, therein declaring the corporate name to be "The trustees in trust for the First Society of the Methodist Episcopal Church of Newark," which is the name in which this suit is brought. From that time, therefore, a corporation has existed which has been competent to hold property and to bring suits. This suit was instituted in 1869.

The first question on the merits naturally arising on these facts is, whether this corporation became entitled to the land conveyed in trust by John Clark, and upon which the house of worship is erected. A preliminary question is raised, however, whether the corporation can try their right in this suit. The defendants deny that the settled rules of law will permit it.

The bill is a bill to quiet title. A bill for that purpose is based upon an actual possession by complainant of the land in dispute, and when sustained, it is upon the ground that complainant has no other means of bringing his title to an adjudication. *Stockton v. Williams*, Wal. Ch., 120; s. c. on appeal, 1 Doug. (Mich.), 546; *Moran v. Palmer*, 13 Mich., 367; *Tabor v. Cook*, 15 Mich., 322. But the evidence in this case does not show that complainants when they filed their bill had the possession necessary. Whether wrongfully or rightfully, the Clarks obtained exclusive possession of the church premises when the quarrel arose, and such possession as complainants obtained afterwards was given

them by the arrangement with the Clarks. This was not an exclusive possession, and it was given and taken on the express understanding between the parties that neither should gain or lose in legal rights thereby. But it is obvious that if the possession thus obtained could be made to support a suit in equity, the party bringing the suit would gain an important right thereby; and this seems to us so manifestly opposed to the understanding that we are compelled to hold that, as a suit to quiet title, this suit cannot be sustained.

There is another branch to the bill, however, in its prayer that the mortgage to John Clark be set aside. For the purpose of relieving the title of an encumbrance, possession in the complainant is not absolutely essential. *Jones v. Smith*, 22 Mich., 360, 365. It would therefore be competent for us to examine and dispose of the question of the validity of this mortgage on this record, and doing that would settle the question of the title. But the title depends upon the effect of the trust deed, and the most important question connected with that has not been argued before us. While therefore we might express an opinion upon all the questions that could legitimately be raised in the case, we deem it hardly proper to do so upon this record, but shall proceed to indicate some of the difficulties.

It is provided by the act of 1855 already referred to, that when a religious society becomes incorporated under its provisions the trustees "may take into their possession and custody all the temporalities of such church, congregation, or society, whether the same shall consist of real or personal estate, and whether the same may have been given, granted, or devised, directly or indirectly, to such church, congregation, or society, or to any other person or persons for their use." Comp. L., § 3060. Under the operation of this statute, and of the provision in the Statute of Uses found in § 4116 of the Compiled Laws, if the land in dispute was held in trust

for this society at the time it became incorporated, the title passed immediately to the corporation, and the trustees no longer retained any legal interest in, or any control over it. *Reformed Church v. Veeder*, 4 Wend., 494; *Miller v. Chittenden*, 4 Iowa, 252. The terms of the trust are somewhat ambiguous, and the deed is open to an interpretation which would preclude any exclusive appropriation by the local society. Regarding this we content ourselves with a reference to the somewhat similar case of *Methodist Society v. Bennett*, 39 Conn., 293, expressing no opinion upon its applicability.

But assuming that the trust was for the exclusive benefit of the local society, and that if valid the land would pass to the church society when incorporated, it is to be said of the trust that it was in terms and apparently in intent perpetual. If it was created in contemplation of an incorporation, the fact does not appear in the deed, and no time was limited within which the incorporation should be effected. The terms of the trust may well be thought inconsistent with any alienation of the land by the trustees, for it was to be perpetually devoted to a particular use, and if so a conveyance would defeat the trust itself. The question which remains open, therefore, is whether a perpetual trust, without power of alienation in the trustees, was not designed. Certainly there could be no power of alienation in any other person or persons, if the trust was valid.

It is provided by statute that "The absolute power of alienation shall not be suspended by any limitation or condition whatever, for a longer period than during the continuance of two lives in being at the creation of the estate," except in a single case not important to be named here. Comp. L., § 4082. Another section makes the estate void in its creation when this provision is disregarded in an attempt to create it. Comp. L., § 4081. Trust estates come under these provisions. Comp. L., § 4124.

If the Law of Charitable Uses were in force in this State, the trust might be upheld under its rules. But that law is generally referred to as the statute of Elizabeth, commonly called the Statute of Charitable Uses, which with other English statutes was repealed in Michigan in 1810. 1 Territorial Laws, 900. There is no evidence that any pre-existing law on that subject has ever been recognized in this State. The Revised Statutes which took effect March 1, 1847, expressly abolished uses and trusts, except as authorized and modified therein, and no distinction is made in the statute between charitable uses and any others. The same requisites are therefore essential to their validity. The New York and Wisconsin decisions, which are made in the light of statutes similar to our own are directly in point here, and we refer to them as rendering any discussion by us unnecessary. *Phelps v. Pond*, 23 N. Y., 69; *Levy v. Levy*, 33 N. Y., 97; *Bascom v. Albertson*, 34 N. Y., 584; *Gram v. Prussia &c., Society*, 36 N. Y., 161; *Holmes v. Mead*, 52 N. Y., 332; *Ruth v. Oberbrunner*, 40 Wis., 238. And it may be well to mention, also, that our statute, after defining cases in which express trusts may be created, none of which would include indefinite charitable trusts, provides for others only in the following words: "For the beneficial interest of any person or persons, when such trust is fully expressed and clearly defined upon the face of the instrument creating it." It is for the very reason that trusts for charitable purposes are not fully expressed and clearly defined that the law of charitable uses has grown up and been maintained.

The decree must be reversed, with costs of this court, and the bill dismissed. Costs of the lower court, however, are discretionary; and the discretion may well be exercised in refusing to award them to defendants. They do not appear to advantage on this record, and they are entitled only to what the strict letter of the law will give them. Their recognition of the trust invited the

litigation, and it is proper that they be left to bear their portion of the costs so far as our decree can accomplish that result.

The other Justices concurred.