## CONSTRUCTION OF A WILL CONTAINING TRUSTS.

Common Pleas Court of Madison County.

MATTHEW L. REA, EXECUTOR OF THE LAST WILL AND
TESTAMENT OF SARAH J. JOHNSON, DECEASED, v. HENRY
CLAY GRIFFIN ET AL.*

Decided, August 14, 1916.

*Wills—Vague Description of Land Devised—Uncertainty as to Remain-
dermen—Failure to Numerate Correctly Members of a Class· Re-
solved in Favor of the Class—Bequest to Charity Held to have
Failed—Where Its Disposition was Left Entirely to the Discretion
of the Executor an Executor Names, Whose Death Antedated that
of the Testatrix—Personal Character of Such a Trust Makes the
Executor Indispensable to Its Validity—Funds Designated for a
Trust which Has Been Declared Void Fall Into the General As-
sets of the Estate—Division of Crops on Lands Devised—Purpose
Shown to Augment a Certain Fund.*

1. A devise of 100 acres of land to be taken from a larger tract, and
directing that the smaller tract shall lie along two certain bound-
ary. lines and have a good outlet on a certain road and be of the
best shape possible, is not so vague and indefinite as to make the
devise void.

2. Where a devise was made to L D for life, with remainder over to
"the brother and two sisters, their heirs and assigns forever,"
when at the time of execution of the will and at testatrix's death
L D had living three brothers, one sister and a niece, the daughter
of a deceased sister, the testatrix will be presumed to have in-
tended to give the remainder to the brothers and sister of L D
as a class; and a mistake in the number of members of such
class will not render the devise void for uncertainty. But where
such class is related to testatrix by affinity only, the case of sur-

*An appeal was taken from so much of this decision as relates to Item
Eleven, and on July 17, 1917, the appeal was sustained by the
Court of Appeals for Madison County. Error was then prosecuted
to the Supreme Court, where on June 21, 1918, the judgment of
the Court of Appeals was reversed and that of the Common Pleas
affirmed, under the title of *Rogerset et al v. Rea, Trustee.*

viving issue of a deceased member of the class does not come within General Code 10581, the devise as to such member lapsing and passing to the members of the class surviving testatrix; and words "heirs and assigns" of the devisee will be construed as words of limitation and not of substitution.

3. A residuary bequest was made to C "for any such charitable purposes that he may deem proper and designate in such amounts as he may designate and think best, for permanent or temporary charities," but C had died prior to the testatrix, and the probate court appointed the executor of the will also trustee to carry out such charitable trust. *Held:* (1st) the item would create a valid charitable trust if the trustee were living. (2) The discretion vested in the named trustee is so personal in its nature and so comprehensive in its character as to make him indispensable to the validity of the trust. (3) No charitable trust was created independent of the named trustee. A bequest to charity generally without the presence of some one to exercise the discretionary power granted in the will, must fail.

4. Where a trustee has been appointed by the court under a certain item of a will, the item being void so far as the trust is concerned, the directions in such item for the trustee to collect certain notes should be carried out by the executor instead of the trustee.

5. Where a testamentary trust is void, testamentary directions to the trustee of such void trust to collect certain notes and place the money in the trust funds will not be carried out by the trustee; but the executor should make such collections, placing same in the general assets of the estate.

6. J. instructed her executors that "all such rents or crops that would be coming to me in case of my death, not so occurring from any of the tracts of land herein specifically devised, shall be divided one-half to my estate and the other half thereof to the person to whom said tract of land is so devised." *Held:* That each devisee was entitled to one-half of the gross rents or crops of his devise, in view of the further facts that entire will reflects a liberal spirit in J, and that the same item containing such devise shows that she was mindful of the usual expense charges on lands.

7. A testamentary direction to J's executors to sell her real estate not specifically devised, and put the proceeds in the trust fund shows that the purpose of J was to augment such fund; and where the trust proved to be void, such sale should not be made in pursuance to said direction; and such realty descends as such and not as personalty.

HORNBECK, J.

This is a suit to construe certain items of the will of Sarah J. Johnson. The petition recites that testatrix died in Champaign county, Ohio, on or about the 13th day of May, 1914; that O. P. Converse and Matthew L. Rea were appointed executors by the will; that O. P. Converse, joint executor under the will and named trustee under Item Eleven thereof, died prior to the testatrix; that the said Matthew L. Rea is the duly appointed, qualified and acting executor of testatrix, and was in June, 1915, appointed trustee under Item Eleven of said will by the Probate Court of Champaign County, Ohio.

The instruction of the court is required of Item Nine of said will, which reads as follows:

"I do hereby give, devise and bequeath unto Lida Douglass, a daughter of Ann Johnson Douglass, and a niece of the late R. M. Johnson, for and during the period of her natural life, one hundred acres of land, to be taken out of what is known as the Warner land, in the following shape, to-wit, to come out of said lands which are situate in Madison County, Ohio, in the best shape possible, so as to lay along the Cartmell and Fitzgerald land lines and at the same time give said one hundred acres a good outlet onto the Kiousville and Jeffersonville road, and at her death all of said one hundred acres is to pass to and vest in the brother and two sisters of the said Lida Douglass, their heirs and assigns forever."

Lida Douglass was one of seven children of Ann Johnson Douglass, having four brothers and two sisters, but at the time of the death of the testatrix and at the date of the execution of her will, said Lida Douglass had living three brothers and one sister and a niece, a daughter of a deceased sister. It is claimed that this item is insufficient in two particulars, first, because of vagueness and indefiniteness in the description of the one hundred acres sought to be devised; and second indefiniteness in the naming of the remaindermen in that the item says "the brother," whereas there were three brothers, and the "two sisters" when there was but one sister.

If the item had devised one hundred acres to Lida Douglass to be taken from the Warner land, and the Warner land had con-

tained more than one hundred acres, the devise would have been valid and a right of selection would have been given the devisee (*Galbraith* v. *Bowen*, 5 Pa. Dist. R., 352). But our description is more specific. We have at least two lines of the one hundred acre tract contemplated by Item Nine fixed, viz., the Cartmell and Fitzgerald land lines, and the further direction that said one hundred acres shall have a good outlet on to the Kiousville and Jeffersonville road, and further that, taking these instructions into consideration the one hundred acres shall be laid out in the "best shape possible."

It is well settled that descriptions for the purpose of a will need not be as complete nor as accurate as for a deed. The language of the item is sufficiently definite to permit the selection of the land devised.

The use of the phrase "best shape possible" indicates a desire on the part of the testatrix to give to the life tenant and remaindermen a farm with lines such as are recognized as being common to well shaped farms, and there should be no serious difficulty in setting off this one hundred acre tract. A competent surveyor should be called and the tract should be laid out in the best shape possible, subject to the requirements of the item, and selection should be made on his recommendation. Although the item probably gives the right of selection, subject to the restrictions therein, to the life tenant and remaindermen, yet I believe the general estate should have a word in naming this surveyor, and would suggest that the executor and life tenant and remaindermen select a competent surveyor to set off the one hundred acre tract, as above indicated.

If this suggestion is not found practicable, or for any reason can not be carried out, let the matter be made known to the court and such further action will be taken as may be necessary to carry out the intention of the item.

The question which arises relative to the failure of the testatrix to indicate with particularity the remaindermen, in that she provides that at the death of Lida Douglass said one hundred acres is to pass to and vest in the *brother* and *two* sisters of the said Lida Douglass, when Lida Douglass had at the time of the

making of the will and at the death of testatrix *three* brothers and *one* sister, is one concerning which the court has been in some doubt.

The life tenant, Lida Douglass, had *four* brothers and *two* sisters, all children of Ann Johnson Douglass. No evidence is offered of the extent of familiarity of the testarix with the nephews and nieces of her husband, nor of how closely she kept in touch with them during the latter years of her life, nor of how well she had in mind their names, nor whether she knew they were living when she made the will, nor does any reason appear why she should favor one of the nephews more than the other. It seems that she desired this one hundred acres in remainder to vest in the children of Ann Johnson Douglass, excepting Lida Douglass. It is evident that Mrs. Johnson must have known that, if Lida Douglass had three brothers, in order to benefit one brother only he must necessarily have been named, that if, having in mind all of the brothers then living she had meant to discriminate against the other two brothers, she certainly would have made it explicit by naming the one brother that she meant to favor. This she failed to do. She did not know of the decease of one of the sisters of Lida Douglass, because she speaks of the two sisters of Lida Douglass. But taken all together she indicates an intention to benefit members of a class, all of whom are alike the objects of her bounty, viz., the children of Ann Johnson Douglass, excepting Lida Douglass, whom she preferred by granting a life estate in the whole of the one hundred acres.

It will not be urged that the meaning of this item is entirely free from speculation, but it seems to come within a class of cases, wherein the failure of the testator to enumerate correctly members of a class, sustaining identical relationship toward him, is resolved in favor of the members of that class.

*Underhill on Wills*, page 742:

"If the testator in providing for the children of another and even when the gift is to his own children, states the number of children he wishes to benefit, and the number which is thus

stated is less than the actual number of children the court has power· to correct his mistake. Where the number is understated, all the children will take the gift, upon the very reasonable presumption that the understatement was unintentional and inadvertent, and that it did not indicate an intention to discriminate among the children. If this construction and correction are· not resorted to and permitted, the provision for children incorrectly enumerated will be void for uncertainty. And the presumption of mistake is recognized where the gift is to the children of the testator as where it is to the children of another." And cases cited.

And in *Vernor* v. *Henry,* 6 Watts. (Pa.) 192, cited by counsel for defendants Martha B. Douglass et al, Vernor devised as follows:

"I give and devise unto the *two* daughters of my deceased brother John Vernor, and unto John T. Vernor, a grandson of my said brother John, deceased, my plantation or tract of land whereon I now live; to have and to hold the same to them, the two daughters of my deceased brother John Vernor and to the said John T. Vernor, their heirs and assigns forever in fee, that is to say each of them is to have an equal third part thereof."

John Vernor, the testator's brother, having had *three* daughters when the will was made, and at the death of the testator, *helā,* that the devise was not void for uncertainty, but that the three daughters took by it two-thirds of the land.

And the court at page 20β says:

"Now in the present case, the circumstance of the testator having used the definite article 'the' in connection with the word 'two' shows pretty clearly that he dictated and made his will under the belief that his brother had left but two daughters, for if he had been impressed differently and had then recollected that there were three, according to what he had been before told, perhaps more than once, and he had only intended to give to two of them, it is difficult, if not impossible to account for his having omitted to describe in some way, the two whom he intended to make the objects of his bounty, so that they might be distinguished from the third whom he wished and decided to exclude."

And at page 206:

"It is merely correcting a mistake of the testator made as to the true number of those who appear to have been all alike the objects of his bounty; and this is done either by striking out the number inserted, without more, or by reading it as if it were written 'all' instead of two or three as it may happen to be. This is every day practice in the construction of wills in order to effectuate the plain intention of the testator. Mr. Roper, who has collated the cases on this subject, lays it down as settled, that 'If a testator bequeath to part only of a number of individuals of the same description and none of them are named nor can be identified, either by the will or by extrensic evidence it is to be presumed that he intended the whole class of persons and was mistaken in the number when confining his bounty to three or four of the class by the insertion of these words. These restrictive expressions are therefore rejected and the entire number of individuals answering the description are admitted as legatees.' See also *Garvey* v. *Herbert*, 19 Ves., 124; *Harrison* v. *Harrison*, 1 Russ & M., 72; *Spencer* v. *Ward*, L. R., 9 Eq., 507, and cases cited in Roper on Legacies, under the heading 'mistake.' "

If the court is correct in concluding that the remainder created by the item is a devise to a class, viz., the brothers and sisters of Lida Douglass, the children of Ann Johnson Douglass, another question is presented and that is, what if any estate do the heirs of the deceased brother, Charles Douglass, and the niece of Lida Douglass, Fate Knock, child of the deceased sister, take?

The common law rule is, that upon the death of a member of a class prior to the death of the testator, the share which that member would have taken, had he lived, lapses and passes to the members of the class surviving the testator (*Wooley et al* v. *Paxson et al*, 46 O. S., 317). Unless this rule has been changed by statute it must govern here.

Section 10581, Revised Statutes of Ohio, provides that—

"When a devise of real or personal estate is made to any child or other relative of the testator, if such child or other relative shall have been dead at the time of the making of the will or shall die thereafter, leaving issue surviving the testator, in either case such issue shall take the estate devised in the same manner as the devisee would have done if he had survived the testator." * * *

Unless the phrase "other relative" in the foregoing statute is broad enough to protect the representatives of the deceased brother and sister of Lida Douglass, it would seem that their shares must fail under the rule prior to the enactment of the statute.

Ann Johnson Douglass was a sister of testatrix's husband, and her children, brothers and sisters of Lida Douglass, are only related to the testatrix by affinity. Our Supreme Court has held in the case of *Schaefer et al* v. *Bernhardt et al,* 76 O. S., 443, in construing the words "other relative" as they occur in Section 5971, R. S., now Section 10580, General Code, that—

"The phrase 'other relative' should, in accordance with the maxim *noscitur a sociis,* be restricted to relationships of the character indicated by the associated word 'child' and regarded as including those which are consanguineous, but excluding those which are affinitive merely."

And see 40 Cyc., 1453 B (11), *Strong* v. *Smith et al,* 48 N. W., 183-5. And this construction will obtain notwithstanding the use of the words, "their heirs and assigns" in the item following the devise in remainder. These words being used as words of limitation and not substitution. *Wood* v. *Seaver,* 158 Mass., 411; 33 N. E., 587; *In re Wells,* 21 N. E., 137; *Chinch* v. *Chinch,* 23 Atl., 302; *Horton* v. *Earl,* 38 N. E., 1136; *Linton* v. *Laycock,* 33 O. S., 128.

In view of the above cited authorities and the construction of Section 10580, General Code of Ohio, the three brothers of Lida Douglass, M. M. Douglass, William W. Douglass and Thomas C. Douglass, and the sister Mary E. Douglass (their heirs and assigns), all of whom survived the testatrix, will share equally i· remainder in the one hundred acre tract, the life estate of which is in Lida Douglass.

The next item presented for consideration is No. 11 of the will of Sarah J. Johnson, which reads as follows:

"After all the balance of the land of which I die seized is sold and converted into money as hereinafter provided, then I do hereby give, devise and bequeath to O. P. Converse of London, Madison county, Ohio, all of the balance and residue of my estate

whether it be money or uncollected notes and securities, in trust for the following purposes, to-wit: To collect any uncollected notes that he can reasonably collect, and then to use all the remainder of such notes and the balance of money belonging to my estate including any that may be so realized from any of the said notes and securities for any such charitable purposes that he may deem proper and designate in such amounts as he may designate and think best, for permanent or temporary charities, and no bond shall be required of him in so doing."

It is claimed by certain of the defendants that this item is void for uncertainty. It is contented by the trustee that it creates a valid trust, and in his answer and cross-petition he says that he desires to designate that the property coming into his hands under Item Eleven, may be turned over to Madison county, Ohio, for the erection of a county hospital and for the maintenance thereof.

The question here raised is approached by the court with the knowledge that, in so far as Item Eleven of the will speaks, Sarah J. Johnson, the testatrix, intended the residue of her estate to pass to permanent or temporary charities; that it is a duty to sustain, if possible, the provisions thereof; that if by any interpretation consonant with the expressed intention of the testatrix this item can be administered it should be done (*White v. Howard*, 38 Conn., 386; *Sanderson v. White*, 18 Pick., 333); that the testatrix designated O. P. Converse to select the particular objects of charity and the beneficiaries thereunder; that the present trustee is as competent to carry out the duties of the trust, if a trust is created, as any that this court could name; that the particular object indicated as the selected charity, a county hospital to be erected and operated on land belonging to Madison county, is a most worthy purpose and one which comes within the purview of "a charity," *i. e.,* "a gift to a general public use which extends to the *rich* as well as the poor." Camden, Ld. Ch., in Ambl., 651.

It is said that "Precedents are useful only slightly, or not at all upon questions of construction." Proceeding on that theory, a conclusion might be drawn at variance with precedents on the

subject, but there is a wealth of decisions on the principle involved here and from these authorities the matter will be decided with the belief that it represents the law at this time.

Counsel have provided most exhaustive and comprehensive briefs on the proposition involved. In the main, the argument against the validity of the item has been confined to the contention that the discretion vested in O. P. Converse, as trustee, was such that without him it must fail. Although the determination of this one phase of the question would dispose of the whole matter effectually, it will be discussed from three angles.

First. Would the item create a charitable trust, if the named trustee were living?

Second. Is the discretion vested in the named trustee so personal in its nature and so comprehensive in its character as to make him indispensable to the validity of the item?

Third. Which is but a corollary of the second. Was a charitable trust created independent of the named trustee?

1st. Would the item create a charitable trust, if the named trustee were living? If O. P. Converse had lived there might be some doubt if the item under consideration created a charitable trust. The discretion vested in him was limited in one particular only. He was required to expend *all* of the residue of the estate of the testatrix for permanent or temporary charities. He had not the power to retain any part of it for himself; it thus fell short of a gift; his discretion extended not only to naming specific purposes of the bequest but specific beneficiaries; it was as broad as the power of the donor herself over the same money for the same purposes; every charity of every kind and description in every corner of the earth is within the scope of the language of the item.

The Circuit Court of Cuyahoga County, as recently as 1911, in the case of *Collings* v. *Davis*, 17 C.C.(N.S.), 221, held a clause in the will under consideration to be void because, among other reasons, the beneficiaries were not restricted to any locality.

And in *Bristol* v. *Bristol* (Conn.), 5 Atl., 687:

"Item. I authorize, empower and direct my wife to permanently dispose for such charitable purpose as she may deem

proper, the other one-fourth of said income from said permanent trust fund.''

The court at page 692 says:

''It is well established with us that a gift to a charitable use must designate the particular charitable use by making the gift to some particular object or purpose that the law recognizes as charitable. It is enough if the object be mentioned and the law can see that it is a charitable use; but it is not enough that the gift be merely to charitable uses or to be used in charity so long as no selection is made from a long list of recognized charitable objects. And it is not enough that some person is named to whom is given the power of naming the charity. That is the testator's own matter. It is his intent that is to determine that. If he chooses to leave the matter wholly to the discretion of some person named, he can do so by making the gift to him, leaving him to use his discretion as to the disposition of it.   *   *   * Here the power given the widow is not to select the particular beneficiaries of a class named, but to select the charity itself. We think that to uphold this case we should have to go beyond the utmost limits to which we have gone in upholding charitable gifts. The bequest being of such a character, it clearly can not be saved by the act of the widow in making a written designation of the charitable purposes which by it she is authorized to select.''

And likewise *Norcross' Admrs.* v. *Murphy's Exr's,* 44 N. J. Eq., 522; 14 Atl., 903; *Beckman* v. *People,* 27 Barb., 260; *Maught* v. *Getzendanner,* 65 Mich., 527; 5 Atl., 471; *Schmucker* v. *Reel,* 61 Mo., 592; *Grimes* v. *Harmon,* 35 Ind., 198; 9 Am. St. Rep., 690; *Coleman* v. *O'Leary,* 114 Ky., 388; 70 S. W., 1068, and *Williams* v. *Kershaw,* 5 Clark & F., 111, cited by counsel for defendants, although this case is virually overruled in *Giles* v. *Burns,* 2 Wiles & Stan., 80.

But there is substantial authority to the effect that the item in the will before us, had the named trustee lived, created a valid charitable trust.

*In re Estate of Mary C. Dulles,* 218 Pa., 162; 67 Atl., 49:

The item under consideration—

"I do hereby give and grant unto my said executors and the *survivors of them* full and unlimited power and authority to pay over, appropriate and dispose of and distribute the said rest, residue and remainder of my estate to and among such religious, charitable and benevolent purposes and objects or institutions as in their discretion shall be best and proper." *Held*, to establish a valid charitable trust.

The court say:

"The discretion which was hers (the testatrix's) to exercise she chose to delegate to her executors. It was her right to do so, and so long as this discretion is not abused, its exercise is as valid as if it were expressly her own."

And quoting Strong, J., in *Domestic & F. Miss. Soc. App.*, 30 Pa., 425, 435:

"The general rule may be stated thus, in the case of a will making a charitable bequest, it is immaterial how vague, indefinite and uncertain the object of the testator's bounty may be, *provided there is a discretionary power vested in some one* in its application to those objects."

To the same effect: *Kinnike's Est.*, 105 Pa.; 25 Atl., 1016; *In re Creighton's Est.* (Neb.), 84 N. W., 273; *Hunt* v. *Fowler*, 121 Ills., 269, 12 N. E., 331; *Hinkley Est.*, 58 Cal., 457; *Jackson* v. *Phillips et al*, 14 Allen, 539; *Grant* v. *Saunders* (Iowa), 95 N. W., 411; *Re Steward*, 26 Wash., 32; 67 Pac., 723; *Miller* v. *Teachout*, 24 O. S., 525; *Hunt* v. *Edgerton*, 9 C.C. (N.S.), 538.

The validity of the clause as presented if the named trustee had lived is not vital here, unless the court is in position to hold that even had he lived the language of the item is too indefinite and vague to creat a charitable trust; this view of the matter the court is not ready to take. The tendency of the holdings seems to be toward the greatest possible liberality favorable to declaring a charitable trust, if the trustee named is given discretion sufficient to define the particular objects of charity to be reached.

2d. Is the discretion vested in O. P. Converse such as to make him indispensable to the validity of the item? The discretion

with which the testator clothed O. P. Converse was so peculiarly personal as to make him essential to the creation of a charitable trust under Item Eleven; he is necessary that the intention of the testatrix may be particularized; that the will may speak definitely he is the *sine qua non*. No other can indicate the testatrix's specific wishes; his purposes were her purposes; the will itself says so. It does not say that his successor may have the power granted to him; nor does it indicate what charities are to be beneficiaries, so that the court or any one else can do aught but act in the dark. Any trustee, other than O. P. Converse, so far as the will speaks, if disposing of the money under Item Eleven, would be placing it solely and entirely with such charities as his own mind suggested and without any expression by the testatrix that the beneficiaries selected by him had been directed by her or reflected her desire.

In *Fontain* v. *Ravenel*, 17 How., 369 (which was a case in which the gift was for general charities, at the discretion of the executors, who were all dead), Judge McLean in the opinion clearly discusses the question. He admitted that the executors, had they been alive, might have executed the trust, but as they were dead, he says at page 386:

"The testator was unwilling to give this discretion to select the objects of his bounty except to his executors. He relied on their discrimination, their judgment, their integrity and fitness to carry out so delicate and important a power. He made no provisions for a failure in this respect by his executors. * * * They died. And now what remains of this bequest on which a court of chancery can act? There must be some creative energy to give embodiment to an intention which was never perfected. Nothing short of the prerogative power, it would seem, can reach this case. There is not only uncertainty in the beneficiaries of this charity, but behind them is a more formidable objection. There is no expressed will of the testator. He intended to speak through his executors or the survivors of them, but by the act of Providence that has become impossible. It is, then, as though he had not spoken. Can any power now speak for him except the *parens patriae*."

In *Chamberlayn* v. *Brockett*, L. J. Ch., 789, testatrix by will gave a legacy of one hundred pounds to each of several persons

"to be applied by each of them to such charitable purposes as each may think most desirable." Some of those persons died in the testatrix's life time. *Held,* that the legacies given to those persons lapsed because the object of the gifts could not be ascertained.

And in *Pritchard* v. *Thompson,* 95 N. Y., 76, in which a certain sum of money was left in trust to be by the named executors or the survivors of them distributed to stipulated charities, as such executors might select, in such sums as they might determine. The court say:

"If they (the executors) refuse to execute it, or the power remains unexecuted, it is not apparent how the court could make a selection from the extensive range of societies referred to, of those that should receive the bequest, or of the proportions in which it should be divided. Neither could the court select individuals to perform a duty devolving upon the trustees, who are selected, no doubt, by reason of personal confidence in their judgment and their capacity for the task imposed."

In *Re Estate of Dulles, supra,* it is said:

"The practical questions, therefore, in such case (referring to charitable bequests wherein discretion was vested in the trustee), are First. Is the testator's general intent ascertainable? and Second. Is there any tribunal provided to ascertain the specific objects to which such intent was to be applied? If so, the trust is not void for uncertainty."

In this case the first question can be answered in the affirmative; but we are constrained to answer the second question in the negative.

And the rule was early enunciated in the leading case of *Witman* v. *Lex,* Searg. & Rawle's Reps., 17-93:

"It is immaterial whether the person to take be *in esse* or not, or whether the legatee at the time of the bequest was a corporation capable of taking or not, or how uncertain the object may be, *provided there be a discretionary power vested anywhere over the application of the testator's bounty to those objects.*"

See *Hibbard* v. *Lamb,* 1 Ambl., 309; *Holland* v. *Peck,* 37 N. C. (2 Ired Eq.), 255; *Gambel* v. *Trippe* (Md.), 15 L. R. A., 235.

3d. Does the item create a charitable trust independent of O. P. Converse. It is contended that the testatrix has, independent of the named trustee and the language pertaining to him, by Item Eleven established a charitable trust, and that equity will not suffer a trust to fall for want of a trustee. *This rule presupposes an established trust.*

The clause in question, eliminating the words stating the extent of discretion reposed in the named trustee, in so far as we need to consider it here, reads as follows: "I do hereby give, devise and bequeath to O. P. Converse * * * all the balance and residue of my estate * * * in trust, for permanent or temporary charities." There is, as before indicated, in the language no limitation in the field of charity. "Permanent or temporary charities" is equivalent to an expression of a general charitable purpose. This being the effect of the language used, will it sustain a charitable trust.

There can be no doubt but that in England, under statute 43 Elizabeth, Chapter 4, and even before that time, under the common law, this item, as above outlined, would have been sustained, *cy pres,* as a charitable trust.

Our law has been an outgrowth of the English jurisprudence on the subject of charitable trusts. The burden of discussion of the cases arising in our courts has revolved around the English precedents in point, whether to follow in the entirety the established holdings of the chancery court relative to charitable trusts, to modify them to more properly represent the spirit and functions of our equity courts, or whether to deny them altogether. The value, therefore, of the cases cited by counsel for and against the validity of Item Eleven, and of all cases considered, depends largely on the attitude assumed by the courts of the states wherein they arose, toward the English construction of the statute of uses.

The following states have adopted, either directly or on principle, the doctrine of the statute of uses, 43 Elizabeth, Chapter 4:

Illinois—*Hoeffer* v. *Clogan.* 171 Ills., 462; 49 N. E., 527.

Massachusetts—*Goings* v. *Emery,* 16 Pick., 107.

Missouri—*Chambers* v. *St. Louis,* 29 Mo., 543.

North Carolina—*State* v. *Gerard*, 37 N. C. (2 Ired Eq.), 210.

Rhode Island—*Pell* v. *Mercer*, 14 R. I., 412.

Maine—*Tappin* v. *Deblois*, 45 Me., 122.

Georgia—*Jones* v. *Habersham*, 107 U. S., 174.

Alabama—*Williams* v. *Pearson*, 38 Ala., 299.

Pennsylvania—*Fontain* v. *Ravenel*, 17 How., 369.

Tennessee—*Dixon* v. *Montgomery*, 1 Swan, 348.

New Jersey—*Thomas* v. *Norris*, 20 N. J. Eq., 489.

Delaware—*State* v. *Griffith*, 2 Del. Ch., 392.

Wisconsin—*Harrington* v. *Pier*, 105 Wis., 485, 82 N. W., 345.

Connecticut—*Ayde* v. *Smith*, 44 Conn., 60.

Indiana—*McCord* v. *Ochiltree*, 8 Blackf., 15.

Ohio. No force as a statute—*Landis* v. *Wooden*, 1 O. S., 160, yet the judges of that state, without any assumption, have applied its principles to all cases of charitable devises as a part of chancery jurisdiction.—*Perin* v. *Carey*, 24 How., 465.

The statute is not in force in the following states:

Maryland—*Barnes* v. *Barnes*, 3 Cranch. C. C., 269; *Halsey* v. *Protestant Episcopal Church*, 75 Md., 275; 23 Atl., 781.

District of Columbia—*Ould* v. *Washington Hospital*, 95 U. S., 303.

Virginia—*Fifield* v. *VanWick*, 94 Va., 557; 27 S. E., 746.

West Virginia—*Wilson* v. *Perry*, 29 W. Va., 169; 1 S. E., 302.

Michigan—Repealed in 1910—*First Society of M. E. Church* v. *Clark*, 41 Mich., 730; 3 N. W., 207.

New York—*Reformed Protestant Dutch Church* v. *Mott*, 7 Paige, 77. But New York by statute in 1893 has vested in equity courts power to sustain charitable trusts, which before that peroid would have been invalid.

The principles of the statute and the common law of England, which it was enacted to supplement, being in effect in Ohio, we must depend on decisions from those jurisdictions wherein a similar position to that of Ohio toward the statute is maintained. That our courts look with favor upon the holdings of those states wherein the spirit of the statute has been upheld, has been indicated by our Supreme Court in the case of *Miller* v. *Teachout*, 24 O. S., 533.

The Lord Chancellor of England was vested, by virtue of his office, not only with the ordinary judicial powers of chancery court, but in addition thereto with prerogative power from the King, as the keeper of the Great Seal. Enunciating decisions from the same court, having these dual powers, it became difficult to determine from which source he was effectuating these general charitable bequests, wherein no mode of disbursement was indicated. It is now very generally understood to have been accomplished by means of the prerogative power rather than by inherent judicial authority.

Our courts by their very nature are confined to inherent judicial authority, and have no other or further power akin to the extra-judicial or prerogative power of the English chancery court. In this fundamental difference is found the reason that our courts have said that they are without source of authority to complete or particularize these bequests to charitable purposes generally.

A consideration of some of the authorities on the method of the chancery court of England in administering bequests such as we are now considering, and a determination wherein the difference lies between the power of our equity courts and that of England, will, in view of the phase of the item that we are now discussing, be of interest, and will demonstrate why it could have been administered in England and not generally in this country.

In *Harrington* v. *Pier*, 105 Wis., 485, 82 N. W., 345, in a discussion of *cy pres* power, it is said:

"*Cy pres* power, as actually understood, has two features,— one, the right to exercise *prerogative authority* enabling the court to deal with a bequest to a charitable use having no designated particular purpose, *as a bequest to charity generally,* treating the purpose as the legatee, or a bequest for an illegal purpose, or some purpose impossible of execution for some reason; and the other, the right by liberal rules of construction, to deal with a trust having a designated particular purpose, though in general terms, and enforce it within the limits of such purpose, supplying the trustee if necessary."

And in *Grimes* v. *Harmon*, 35 Ind., 198, 9 Am. Rep., 690:

"The prerogative power of the King, exercised by the chancellor with reference to charitable trusts in England, was derived directly from the king under his sign manual, and was not conferred on the courts by statute of 43 Elizabeth."

And in *Newson* v. *Starke*, 48 Ga., 88 :

. "In determining what bequests for charitable purposes are definite and specific and capable of being executed, a court is to be guided by well settled rules of the court of chancery in England in the exercise of its *inherent chancery jurisdiction* over charities, as distinguished from its jurisdiction as agent of the King in the exercise of *his prerogative power* to direct and give effect to indefinite charitable bequests. It is only that branch of equity jurisdiction which undertakes to carry into effect *charities generally* where there are no trustees, which is *prerogative;* when trustees are appointed or when the objects of the charity are pointed out, even generally, the court acts by its inherent power over trusts."

And in *Moore* v. *Moore*, 4 Dana, 354, 29 Am. Dec., 417 :

"When a charity is not given to trustees, and *no particular object is designated,* nor any person appointed to select the object, the King appoints the object under his sign manual, and the chancellor, * * * directs the application by the Attorney-General to the Crown to make the appointment."

And in *Shield* v. *Jolly*, 1 Rich. Eq., 99, 42 Am. Dec., 349 :

"A charity at large, where there is a gift simply to purposes of charity, without appointment of any trustee, is not within the jurisdiction of the chancellor as a court of equity, but is one to be enforced by the chancellor * * * by virtue of the prerogative."

And *Rhode Island Hospital Trust Co.* v. *Olney*, 14 R. I., 449 :

. "The general devolution upon the courts of all judicial power in respect to charities includes so much of the *cy pres* power as is exercised by the English chancellor, *without recourse to the prerogative powers,* delegated to it in particular cases by the sign manual."

And in the noted case of *Jackson* v. *Phillips*, 14 Allen, 539, wherein the court was considering the validity of articles in the will of Francis Jackson, of Boston, in which he gave to William Lloyd Garrison, Wendell Phillips et al, a certain sum of money in trust to create public sentiment against negro slavery, Judge Gray in a general discussion of the *cy pres* doctrine at page 576 of the opinion says:

"The second class of bequests which are disposed of by the King's sign manual is of gifts to charity generally, with no use specified, no trust interposed and either no provision made for an appointment or the *power of appointment delegated to particular persons who die without exercising it.*" Citing Boyle on Charities, 238-9. "This too, is not the judicial power of expounding and carrying out the testator's intention but a *prerogative power* of ordaining what the testator has failed to express. *It has never so far as we know been introduced into the practice of any court in this country* and if it exists anywhere here it is in the legislature of the commonwealth as succeeding to the power of the King as *parens patriae.* It certainly can not be exercised by the judiciary of a state whose constitution declares that 'the judicial department shall never exercise the legislative and executive powers, or either of them; to the end it may be a government of laws and not of men.' "

See also *Pell* v. *Mercer*, 14 R. I., 436; *Morgridge* v. *Thackwell*, 7 Ves., 36; *Perry on Trust.* Par. 718; Underhill on Wills, Par. 824-827; *Kelly* v. *Nichols*, 18 R. I., 62; 25 Atl., 840.

Notwithstanding the trend of the above cited decisions and the unqualified language of *Jackson* v. *Phillips*, *supra*, the courts of Massachusetts have sustained *cy pres* a bequest to charity generally, when the trustee named to whom was delegated broadest possible discretionary power, died before accepting the trust. A case more nearly like the one at bar than any other found, wherein the trust is sustained, is that of *Minot* v. *Baker*, 17 N. E., 839, decided by the Supreme Court of Massachusetts in 1888. Here the testator left the residue to a trustee "to be disposed of by him for such charitable purposes as he shall think proper." The trustee died, having rendered no account to the probate court, and having disposed of only a small portion of the

residuary estate in his hands for charitable purposes. He had not indicated any scheme for the disposal of the remainder of the estate in his hands. *Held,* that the gift should be applied to charitable purposes according to a scheme under the direction of the court. In this case the executor of the estate was likewise the trustee under the will, but had not been appointed by the probate court as trustee or qualified as such. He died without attempting to dispose of the residue of the estate for any charitable purpose whatever.

And in *Re Schouler,* 134 Mass., 426, testator authorized a person to withdraw the contents of the testator's bank book from a certain bank after his death "said money to be disposed of as follows: Part for my burial and funeral expenses and the residue for charitable purposes, masses," etc.

*Held,* that the will created a valid trust and that the nominee having died without having qualified as trustee, the court might appoint a successor who should administer the trust. This item, however, is not as broad in language as the one we have under consideration, it being possible to particularize it to the extent of restricting the charitable use to masses, in which event a trust undoubtedly would be created and a trustee necessarily appointed.

Outside of the state of Massachusetts, I have been unable to find a decision in any American case sustaining a charitable bequest, under conditions as now obtain in relation to Item Eleven of the Sarah J. Johnson will.

*Webster* v. *Morris,* 28 N. W., 353 (Wis.), 5 Syl., a bequest which upon the named contingency, is to be spent for charitable purposes, at large, is too indefinite to be executed. And the court at page 363, referring to the *cy pres* power say:

"Before that power can be exercised, however, the scheme of charity must be sufficiently indicated, or a method provided whereby it may be ascertained and its object made sufficiently certain to enable the court to enforce the execution of the trust according to such scheme and for such object. It must be of such a tangible nature that the court can deal with it. The mere direction to expend money 'for charitable purposes' at large, is too indefinite and uncertain to be carried into execution."

See also *Norcross' Admrs.* v. *Murphy's Excrs., supra.*

And in *Spaulding* v. *St. Joseph's Industrial School for Boys* (Ky.), 54 S. W., 200, the court at page 206, referring to the opinion of Chief Justice Robertson, in *Moore's Heirs* v. *Moore's Devisees, supra,* say:

"We are satisfied that the *cy pres* doctrine is not or should not be, a judicial doctrine, except in one kind of case; and that is where there is an available charity to an identined or ascertainable object and a particular mode, inadequate, illegal or inappropriate, or which happens to fail has been prescribed. In such a case a court of equity may substitute or sanction any other mode that may be lawful and suitable, and will effectuate the declared intention of the donor, and not arbitrarily and in the dark presuming on his motives or wishes, declare an object for him. A court may act judicially as long as it effectuates the lawful intention of the donor. But it does not act judicially when it applies his bounty to a specific object of charity selected by itself, merely because he had dedicated it to *charity generally* . * * * for the court can not know or decide that he would have been willing that it should be applied to the object to which the judge, in the plenitude of his unregulated discretion and peculiar benevolence, has seen fit to decree its appropriation, whereby he and not the donor, in effect and at last creates the charity."

And in *Kronshage* v. *Barrell* (Wis.), 97 N. W., 929:

"All that is necessary is that a devisor shall place his property in trust and designate a charitable purpose of his own *narrower than the field of charity generally.* The court can and will then see to it that a trustee is provided, if none be designated, and that means will be found to apply the property to the purposes, if no method be prescribed." *St. James Orphan Asylum* v. *Shelby,* 60 Neb., 796, 80 N. W., 273; *Hunt* v. *Fowler,* 121 Ill., 269, 17 N. E., 491; *Erskine* v. *Whitehead,* 84 Ind., 359; *Miller* v. *Chittenden,* 2 Iowa, 315; *Holland* v. *Peck, supra; Albery* v. *Sessions,* 2 Ohio N. P., 237; *Johnson* v. *Johnson,* 92 Tenn., 559, 22 L. R. A., 179, 36 Am. St. Rep., 104, 23 S. W., 114; *Heiss* v. *Murphy,* 40 Wis., 276.

The cases cited by counsel for the trustees have been examined with care, and none is found which can not be reconciled with the

conclusion to which the court is compelled to come by force of the authorities hereinbefore cited and many others considered.

Let us consider briefly most of the cases cited in support of the item: *Umrey, Exrs.,* v. *Wooden et al,* 1 O. S., 160, the syllabus of which lays down the proposition that "No trust shall fail for want of a trustee." The bequest here was to two named executors (who were qualified and acting) for the benefit of the poor and needy of two specified townships, and full discretion was placed in the named executors. Here the will not only particularizes the charity but it is specially protected by statute, "That all gifts * * * and bequests * * * to the poor of any township by will or otherwise shall be valid in law."

*Trustees of the McIntyre Poor School* v. *the Zanesville Canal & Mfg. Co.,* 9 O., 203, and a later case growing out of the same will in the 17 O. S., 352, the devise was for the purpose of establishing *a school for poor children within the town of Zanesville.* This item was claimed to be void for uncertainty. The item was sustained. The difference in characterizing the charity there and in the instant case is apparent and the court indicate in the first case, at page 287, the particulars wherein the item we are examining will not stand the test, when they say, "Where *a trust is plainly defined* and *a trustee exists* capable of holding the property and executing the trust, it has never been doubted that chancery has jurisdiction over it."

And the leading case of *Miller* v. *Teachout, supra,* where the residue of the estate was to be appropriated by the executor to the advancement of the Christian religion at his discretion. The executor accepted the trust. The court in the syllabus carefully state, that they are not passing on the question that we have under consideration, when they say:

"The testator had conferred ample power upon the executor to relieve the bequest of all objections arising from its indefinite character, and *that so long as no obstacle exists to the exercise of the power* at the proper time, the courts of this state will not, in advance of that time, interpose * * * to prevent its exercise."

And early in the opinion, at page 533, the court conclude that a *trust is created* by the language of the Miller will; that the purpose, the Christian religion, is sufficiently definite, and that therefore "No elaborate consideration is required of the much controverted question as to the limits of judicial power that may be exercised by courts of equity over charitable trusts," and note the language immediately following:

"Whenever a trust is established, and the subject of the trust is so certain that it may be known to what it attaches and the object *is so defined* that it may be known who is the intended beneficiary, there is no question whether the trust be to a charitable use or not, but that it is valid. But, however faultless the trust may be in other respects, if it be wanting in *certainty as to its object,* as a general rule, the trust must fail."

As a whole this case is strong authority to sustain the validity of the item under consideration, if O. P. Converse had lived, but careful reading of it certainly strengthens the conclusion of the courts of other states hereinbefore cited, to the effect that a bequest to charity generally, without the presence of some one to exercise the discretionary power granted in the will, must fail.

*Grant* v. *Saunders,* 121 Iowa, 80; 95 N. W., 411:

Here the court has under consideration a bequest for the benefit of the poor, a trustee named with power of selection. This case is very similar to the case of *Miller* v. *Teachout,* but the court go one step further in discussing the law in the event that the named trustee should for some reason later be unable to act. And although they expressly say that "such a contingency has not arisen, nor may it ever arise," they add by way of *gratis dictum* "if it should ever become necessary for the court to appoint another trustee, we see no insurmountable obstacle in the way of its so doing." And this conclusion may be correct for the purpose named in the bequest is much narrower than the field of charity generally.

Other cases cited are very similar to those immediately hereinbefore considered, and none go any further toward widening the

authority of courts over charitable trusts than those specifically discussed.

Although the exact question presented in Item Eleven has not been decided in Ohio, so far as investigation discloses, yet in the light of the adjudication of the courts of other states, wherein the matter has been decided, and the inferential reasoning of the available cases in our state, the law at this time will not permit of the administration of this item, and it is therefore void, in so much thereof as pertains to a charitable trust and the power to administer the same, and the testatrix as to the residue of her estate as described in said item, died intestate.

Further instruction is requested as to the duties of the plaintiff "with reference to the estate of said Sarah J. Johnson, which would go under said Item Eleven, if found invalid, as well as the distribution thereof." The matter of the division of the money and personal effects of the estate will, according to agreement, b. deferred to the time of distribution.

The executor having general power to convert the notes of the estate into money, unless otherwise provided, it would seem ti.. since the purpose for which the trustee was authorized to coll( the uncollected notes has failed, and if the present trustee did collect them he would have to turn the proceeds over to the executor, and inasmuch as the executor and the trustee are one and the same person—that the feasible plan would be for the executor, as such, to convert the uncollected notes into money and place the same in the general assets of the estate.

Plaintiff further asks instruction of the court as to his duties under Item Twelve of said will, to-wit:

"I do hereby nominate and appoint O. P. Converse of London, Ohio, and M. L. Rea of Madison county, Ohio, executors of this my last will and testament, hereby authorizing and empowering them to compromise, adjust, release and discharge in such manner and upon such terms as they may deem best, all debts due me or claims made against my estate, and I do hereby further authorize and empower my executors to take immediate charge of all of the real estate of which I may die seized whether it be in my name or the name of my deceased husband Richard M. Johnson, to fully carry out any and all leases or rentals therefor, and to

collect all rents or grain or crops that may be coming to me or my estate therefrom for that rental year which will be to the first day of the month of March following my death, and all such rents or crops that would be coming to me in case of my death not so occurring from any of the tracts of land herein specifically devised shall be divided one half to my estate and the other half thereof to the person to whom said tract of land is so devised, regardless of the time of year at which my death shall occur; and said executors are to continue to manage and control, rent and make leases for any and all of the balance of my said land until such time as they may conclude to and do sell the same as hereinafter provided, the income derived therefrom after paying taxes, assessments and expenses to go into my general estate, with full power to keep up all repairs thereon and to do any and all such other acts or things that they may deem best until so sold as aforesaid. Whether or not, in the division of the rents provided therein collected during the year in which she died, whether it should be the gross rents from said lands, or the net rents after the payment of taxes and expenses, incident to said leases." * * *

The language of the item essential to a determination of its meaning is "and *all* such rents or crops that would be coming to me in case of my death not so occurring * * * shall be divided one half to my estate, and the other half thereof to the person to whom said tract of land is so devised." The rule is (40 Cyc., 1537) that, "Where the income or use of realty is given the presumption is that the net income or profit is meant and that the beneficiary must pay out of the gross receipts all charges against the real estate." But that rule is ordinarily applied where the whole of realty is given or where the language of a will does not expressly show an intent to vary the rule.

This testatrix had a valuable estate, both real and personal. She provided for gifts to many charitable and religious institutions; she undertook to bequeath all the residue of her estate to charity. In the light of her liberal intention it is not contrary to the spirit of the will to conclude that when she said *all* such rents or crops that she meant gross rents and crops. Again, she knew that one-half of all the rents would be in all probability amply sufficient to pay the taxes and expenses incident to the leases. That she did not use the word *all* inadvertently and with-

out thought of taxes and incidental expenses, is indicated further along in the same item in which the provision that we are now considering occurs, in the use of this language, "The income derived therefrom, *after paying taxes, assessments and expenses* to go into my general estate." * * *   And with the proof, that the thought of taxes, assessments, etc., was in her mind at the time this item was drafted, it would seem, that if she had expected the specific devisees to bear one-half of the expenses incident to the leases, that she would not have said one-half of all crops, but would have provided that the crops be sold and from the money derived therefrom that the proper deduction of expenses be made.

The gross rents and crops from the lands specifically devised should be divided one-half to the respective devisees, and one-half to the general estate. See *In re Walford et al*, 23 R. I., 455, 50 Atl., 837.

Further inquiry is made by the plaintiff "as to what his duties are as to the sale of the real estate not specifically devised in said will, in the event of the finding that Item Eleven of said will is void. Whether he is still to make the sale of said real estate and divide the proceeds among the parties entitled to the real estate, or, whether said power of sale becomes void and the persons entitled to the real estate would be entitled to the same as realty instead of personalty."

Item Twelve was drawn in harmony with and in conformance to the spirit and intent of Item Eleven, had conditions made possible to effectuate the plan of the item. The necessity and purpose of the sale is indicated in the item, viz., to contribute to the trust fund for charity. This necessity and purpose failing because of the invalidity of Item Eleven, there is left no reason under the will for the sale of the real estate and that power should not be exercised, and the real estate will pass as intestate property.